Mintz Trust.

Argued November 25, 1970. Before BELL, C. J., COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*David Berger,* with him *Howard L. Schambelan* and *Harold Berger,* for appellant.

*Louis J. Goffman,* with him *H. Robert Fiebach* and *Morris H. Goldman,* for appellees.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:
This appeal involves an extended intra-family dispute between a sister and her brothers concerning the administration of a trust of which the brothers were the trustees and the sister the beneficiary. Appellant, the sister, alleges the trustees entered into numerous transactions which violated not only their general fiduciary duties of loyalty and good faith but also the express terms of the trust instrument. We are in agreement with the adjudication of the Orphans' Court of Philadelphia that no breach of trust justifying relief is evident on the record before us.

The facts as found by the auditing judge and approved by the court en banc insofar as they are relevant to this appeal are as follows:

Luria Brothers and Company was a well established scrap metals brokerage concern, owned and operated by members of three branches of a closely-knit family, headed respectively by three brothers, Abe, Alec, and Max Luria. By 1935, Abe Luria had passed away, and Max's family and Alec Luria each owned 44½% of the outstanding stock of the company. Alec Luria was trustee of the deceased brother's estate, and he controlled the remaining 11% owned by Abe Luria's family. The two dominant groups were therefore the Max Luria and Alec Luria families. Max and Alec were actively engaged in the business, and their families depended on Luria Brothers for their livelihoods.

Max Luria had five sons—Herbert B., William, I. David, Henry T., and Mortimer F.,—and one daughter, Dorothy F. Luria (now Dorothy Luria Mintz). His sons were involved in the family business in varying capacities and degrees.

Alec Luria had only one son, Herbert, who was likewise employed by Luria Brothers. Nonfamily members also held important positions in the concern and were competing for recognition. Friction existed between the two families as Max favored the continued advancement of his sons despite possible adverse consequences to the nonfamily employees.

In 1935, Max and Alec created Luria Steel and Trading Company with the understanding that the new concern would be developed for Max's sons. Luria Steel commenced operations in 1937 and undertook to manage all of the foreign export and brokerage business of Luria Brothers. Four of Max's five sons left Luria Brothers to assume positions in the new company. The friction had been temporarily lessened.

Max Luria died in 1939. In his will he called for harmony between his sons and his brother. Within a month of his death a trust was established by his widow and the six children known as the Max Luria Family Trust to consolidate the family property and centralize control in the trustees, who were Herbert, William, I. David and Henry T. Luria.

Dorothy Luria Mintz was a party to this irrevocable deed of trust executed on December 9, 1939, but made effective on October 3, 1939. By the agreement she named herself as life tenant with a special power of appointment during her lifetime and a power to appoint the principal by will. This trust is the subject of the appeal now before us. However, before outlining its provisions and the allegations of breach of fiduciary duty asserted by Dorothy against her four brothers, certain additional facts concerning the growth of Luria Brothers and Luria Steel should be mentioned.

Herbert B. Luria, Max's eldest son, assumed the mantle of leadership of his side of the family subsequent to his father's death, and efforts were made to proceed amicably. In 1940, a "Harmony Agreement"

was executed by members of both families, including Dorothy. The agreement entitled Max's family to "put" to Alec their shares of Luria Brothers. Conversely, Alec Luria acquired the right to tender all his Luria Steel stock as part of the purchase price for the Luria Brothers stock. The agreement thus recognized the division of interest between the two families.

Tranquility reigned between the two camps until the end of 1944. Then, in December of that year, six key employees of Luria Brothers sent in letters of resignation, because they feared that upon Alec Luria's death, Max's sons would again control the business. The six employees, representatives of both families, and counsel met throughout the night of December 28, 1944 at the Ritz Carlton Hotel in Philadelphia.

Alec Luria's position was that either the key employees remain, or the business should be liquidated. The key men would only continue their employment if Max Luria's sons, with the exception of William, left the active management of Luria Brothers. Herbert B. Luria refused to relinquish his family's right to participate in management decisions so long as they had funds invested in the business.

The parties finally agreed that the Max Luria family would sell its 6,000 shares of Luria Brothers to Alec Luria for $350 per share, which was $107 more than the stock's book value. Similarly, the Max Luria family was to acquire Alec Luria's stock in Luria Steel at $216.31 per share, which was the book value. The directors of Luria Brothers authorized a loan of the necessary funds to purchase 3,250 of its shares from the Max Luria family. A "memorandum of agreement" embodying these transactions was executed on January 2, 1945.

As a result, the trusts for the six children of Max Luria each acquired 200 shares of Luria Steel, increasing their respective holdings from 100 to 300 shares.

194

In addition, each trust received $187,000 in cash. An investment counselor gave uncontradicted testimony that Max's family received $641,000 more for its holdings in Luria Brothers through the January 2, 1945 agreement than it would have had the two companies been liquidated at that time.

The Max Luria family then set about reinvigorating Luria Steel. The auditing judge found that the scrap metal business was hazardous at that time, with the war coming to a close. So, while the brothers invested $625,000 in the stock of the company, they purchased $90,000 worth of Luria Steel debentures paying 6% interest and $5,000 worth of United States Treasury Bonds for Dorothy. This was done, according to the findings of the auditing judge, for the purpose of insuring Dorothy an annual income and to protect her funds from a high risk investment. The bonds were subordinated to loans made by financial institutions, but were a debt of the corporation and thus would have had to be paid prior to any distribution of assets to the shareholders upon liquidation. The purchase of these bonds was made after the family's counsel had advised the trustees that no violation of the deed of trust would occur in making such an investment.

In 1958, Herbert Luria died. The trustees rendered an accounting on April 30, 1958, to which Dorothy Luria Mintz filed various objections. Lengthy litigation ensued. At one point, a substantial settlement was agreed upon by counsel, but appellant refused to compromise, preferring to rely on a judicial resolution of the dispute. Finally, on March 14, 1968, the auditing judge denied all of appellant's objections to the accounting in a lengthy opinion. See *Luria Trust*, 45 D. & C. 2d 749 (1968). The court en banc likewise dismissed appellant's exceptions to the adjudication on December 26, 1968. A schedule of distribution was then filed to which appellant also objected. Her objections

were dismissed by the auditing judge on February 16, 1970, and this supplemental adjudication was confirmed by the court en banc on May 6, 1970. The instant appeal ensued.

Appellant challenges, inter alia, numerous transactions of the trustees, including the sale of her interest in Luria Brothers; the purchase of the $90,000 worth of 6% debentures of Luria Steel; the failure to purchase Luria Steel stock for her while it was being purchased for other trustees; holding the Luria Steel stock for more than a decade although it paid no dividends; the utilization of $5,000 of her trust funds by the trustees in making a loan to Luria Steel Supply Company;[1] and the making of another noninterest bearing loan of $6,516.67 of her funds on December 5, 1940, to the estate of Max Luria which was not repaid until January 8, 1959.

Appellant bases her not entirely consistent arguments on two general theories. The complained of transactions are either breaches of fiduciary duty owing to lack of reasonable care and disloyalty on the part of the trustees, or they allegedly violate the equality clause in Article I of the trust, which provides: "When investments are purchased by the Trustees, the same investment shall be bought for each trust, and the amount invested for each trust shall be equal. When securities are sold, they shall be sold equally from each Trust."

Appellant presents a somewhat different factual background than that approved by the court en banc and set forth above. She asserts that rather than attempting to provide her an annual income, her brothers and trustees were actually bent on resolving a business problem which affected their selfish personal interests.

---

[1] Not Luria Steel and Trading Company.

Before examining each of appellant's specific contentions, a word should be said about our scope of review.

"At the outset of this case we are confronted by a rule of this Court which has the effect of a rule of law. *We will not retry this case.* The question for us to consider is, first, whether there is evidence to support the findings of fact and whether the findings of fact support the decree. The court below and the court en banc made a thorough review of all the evidence and arrived at certain findings. If the evidence supports the findings and the findings in turn justify the decree, the decree will not be set aside. . . .

. . .

. . . "It must be thoroughly understood that, in cases of this character, the findings of the chancellor supported by the court en banc must be considered just as binding on appellate courts as the verdict of a jury.* Of course, if there is no evidence to support them or if it appears from the record that there is a capricious disbelief of evidence then the findings are worthless." *Pusey's Estate,* 321 Pa. 248, 260, 261, 184 Atl. 844, 849, 850 (1936) ; accord, *Holtz Will,* 422 Pa. 540, 544-45, 222 A. 2d 885, 888 (1966).

Appellant would have us find, in effect, that a capricious disbelief existed in this case because the auditing judge allegedly not only considered but also became irritated at Dorothy's refusal to compromise, which prejudiced his decision and the court en banc likewise confirmed the adjudication due to this refusal of an "eminently fair" settlement.

After carefully reviewing the extensive record before us, we are persuaded that the auditing judge carried out his duties responsibly and fairly in the best traditions of his judicial office. Settlements are favored in the law, particularly where the dispute is among family members. See *Brereton Estate,* 388 Pa.

206, 130 A. 2d 453 (1957); see generally, 1 P.L.E. Accords and Compromise §2 (1957). The auditing judge vigorously encouraged settlement, but in no way jeopardized the litigants' rights to pursue any relief available by resort to the judicial process.[2] The record is devoid of "sufficient facts" demonstrating that the auditing judge displayed the slightest bias or harbored any capricious disbelief of the evidence in his disposition of the case. See *Pusey's Estate*, supra at 262, 184 Atl. at 850.[3]

---

[2] For example, on June 7, 1967, the auditing judge stated to appellant: "I want to say again, Mrs. Mintz, that this matter calls for settlement and I urge upon you not to sacrifice what I consider the settlement offered by your brothers to be a good one, and I think you should not lose the opportunity to go through with that settlement, because if you do lose that opportunity there will be a decision by this court that may or may not be to your advantage, much as you would hope it to be and from whatever the decision might be there might well be an appeal, which would involve another long delay; so, for your own peace of mind I urge upon you to cooperate fully with your counsel and follow their advice."

The court made other similar statements at various times throughout the trial which were entirely proper. At the end of the litigation, the court stated to all parties: "I want to say that despite the objections on one side or the other, and despite many remarks made by the court in this matter, I assure you I have no disposition one way or the other to decide this case and will not have until I have had an opportunity to read the testimony again and to read your briefs."

In his adjudication, the auditing judge makes reference to the settlement negotiations for the sole purpose of explaining the unusual length of this litigation. He stated: ". . . The protracted course of the litigation was due in part to delay of counsel in producing witnesses, in part to illness of Mrs. Mintz and in part to continuing efforts of the parties to achieve a settlement. Throughout months and years these efforts were made with the result that a settlement was agreed upon by counsel. Despite expectations that it would be accepted by the objector, Dorothy Luria Mintz, the proposed settlement was declined." *Luria Trust*, supra at 750-51.

We find nothing improper in such statements.

[3] "Capricious disbelief is not merely disbelieving a witness. To constitute capricious disbelief there must be a wilful, deliberate

We turn now to the specific transactions challenged by appellant.

### Sale of Luria Brothers Stock

Appellant contends that her income producing shares in Luria Brothers should never have been sold. She asserts that her interests were ignored in fashioning the January 2, 1945 agreement, and that the trustees' sole thought was resolving personal jealousies between the male members of the two sides of the family.

We are in agreement with the view of the auditing judge on this issue. The sale of the Luria Brothers stock was entirely proper under the circumstances. The evidence discloses two realistic alternatives existed at the time; either the stock had to be sold or the company would be liquidated. By selling the stock, the trustees gained $641,000 more than they would have had Luria Brothers been liquidated. The proceeds of the sale were divided equally among the six trusts.

Furthermore, in our view, the trust instrument itself authorized the trustees to exchange the Luria Brothers stock for Luria Steel stock and cash. Article IX provides: "The stock of Luria Brothers & Company, Inc., and Luria Steel and Trading Corporation deposited in trust hereunder *or any securities for which the same may be exchanged by reason of any merger or consolidation of either or both of the companies by which they have been issued,* shall be retained by the Trustees hereunder and not be disposed of except with the consent

---

disbelief of an apparently trustworthy witness, whose testimony one of ordinary intelligence could not possibly challenge or entertain the slightest doubt as to its truth. To charge a judge with capricious disbelief, it must be so flagrant as to be repugnant to a man of reasonable intelligence." *Pusey's Estate,* supra at 262-63, 184 Atl. at 850.

of all the acting Trustees hereunder until the death of the last surviving of the original Settlors." (Emphasis added.)

Additionally, the 1940 harmony agreement signed by members of the two family branches, including Dorothy, unmistakably and explicitly foretold of the type of arrangement that was made in 1945. Appellant cannot now be heard to complain of this transaction, see *Landis Trust*, 382 Pa. 486, 494, 115 A. 2d 167, 171 (1955), and we agree with the auditing judge that the trustees acted in the utmost good faith in entering into the agreement for the sale of Luria Brothers stock.

## Retention of Luria Steel Stock

Appellant contends trustees acted neither prudently nor in good faith in acquiring and holding the Luria Steel shares for her because they knew the stock would not be income producing. We do not agree.

Preliminarily it should be observed, as the auditing court noted, that appellant's position on this issue is fundamentally inconsistent with the next issue to be discussed, namely the investment in Luria Steel debentures. She is simultaneously objecting to the retention of nondividend paying stock and the failure to purchase more of this nondividend paying stock to keep her trust "equal" with that of her brothers.

Article IX of the indenture quoted above specifically authorizes the trusts to hold Luria Steel stock. The January 2, 1945 agreement increased the holdings of each trust equally by two hundred shares. The above discussion has indicated the reasonableness of that agreement in light of the emergency situation confronting the family business at that time. There is no evidence that the trustees "intended" Luria Steel pay no dividends when they entered into the agreement. Whether to pay an annual dividend is an internal de-

cision of the corporation not subject to the general supervisory power of the orphans' court. See *Watson's Estate,* 314 Pa. 179, 170 Atl. 254 (1934); *Nixon's Estate,* 239 Pa. 270, 86 Atl. 849 (1913); *Goetz Estate (No. 1),* 236 Pa. 630, 85 Atl. 65 (1912).

### Purchase of Luria Steel Debentures

Appellant seeks to surcharge trustees for the acquisition of the 6% Luria Steel notes because the purchase violated the equality provision of Article I of the trust set forth above.[4] We are unpersuaded for several reasons.

Counsel, who had prepared the trust instrument and had advised the entire Luria family for many years, testified at the hearing that he had approved of the trustees' plan to acquire the notes for Dorothy because in his view, and in the view of Max Luria, the term "investment" had always applied to nonfamily enterprises. Thus, counsel believed Article I was inoperative as to investments in either Luria Brothers or Luria Steel.

We recognize that when a fiduciary acts upon the advice of counsel, such fact is a factor to be considered in determining good faith but is not a blanket immunity in all circumstances. See *Vandergrift Estate,* 406 Pa. 14, 37 n. 14, 177 A. 2d 432, 443 n. 14 (1962); *Corr Estate,* 358 Pa. 591, 600, 58 A. 2d 347, 351 (1948); *Borden Trust,* 358 Pa. 138, 143, 56 A. 2d 108, 110-11 (1948). However, we find no error in the auditing judge's determination that the trustees here acted in complete good faith. " 'Where a guardian or other fiduciary acts in good faith under advice of a compe-

---

[4] While appellant received the $90,000 worth of notes, the trustees each acquired 1,230 additional shares in Luria Steel during the ensuing months, 720 shares apiece on May 1, 1945, and 510 shares apiece on December 31, 1946.

tent lawyer, he is not liable for mistakes of law, if such there be, or for errors of judgment': Dempster's Estate, 308 Pa. 153, 158. See also Riebel's Estate, 321 Pa. 145, 149; Henry's Estate, . . . [341 Pa. 439, 447, 19 A. 2d 66, 69 (1941)]; Kline's Estate, 280 Pa. 41, 44." *Kohler Estate,* 348 Pa. 55, 58, 33 A. 2d 920, 922 (1943).

Furthermore, it is well established that an orphans' court possesses the power to approve a deviation from the express terms of a trust nunc pro tunc, if it reviews the subject as if the question had been presented to the court at the time the investments were made. See *Henry's Estate,* 341 Pa. 439, 444, 19 A. 2d 66, 69 (1941); Restatement (Second) of Trusts §167, comments e, f (1959). In effect, that is precisely the determination of the auditing judge although it is not specifically stated as such.[5] The court preferred to rely on the doctrine of laches and appellant's full knowledge of the facts. Yet, the court's opinion clearly contains both a thorough assessment of the situation facing the Luria family and its enterprises at the outset of 1945 and a conclusion that the departure from the equality clause by purchasing the notes was totally prudent and permissible under the circumstances, for appellant was thereby provided with a steady source

---

[5] Both briefs assert the auditing judge did make such a determination. The relevant portion of his opinion reads:

"The trustees might have petitioned this court in 1945 for leave to depart from the provision of the investment clause of the deed in order to accomplish the result desired, namely, that Dorothy's trust assets be safely invested and at the same time yield the necessary income. Had they petitioned the court it would likely have given the required permission. Longbotham's Estate, 346 Pa. 94 (1943); Brock v. Pennsylvania Steel Co., 203 Pa. 249 (1902); Girard Estate, 73 D. & C. 42 (O.C. Phila. Co. 1950).

"The trustees after 1945 could have petitioned for approval of the deviation, nunc pro tunc: Henry's Estate, 341 Pa. 439 (1941); Beebe's Estate, 51 D. & C. 39 (O.C. Phila. Co. 1924); Estate of Rebecca Cridland, 132 Pa. 479 (1890)." *Luria Trust,* supra at 777.

of income greater than would have been otherwise avail-able.  See *Luria Trust,* supra at 760-69.

Appellant responds that even if the "emergency" in January, 1945, justified a departure from the express terms of the trust, no emergency existed when the proceeds of the transfers were to be reinvested.

We are in accord with the auditing judge's implied conclusion to the contrary. Luria Steel was in desperate straits in 1945, being little more than a corporate shell. The need for additional capital was urgent, yet the trustees had a responsibility to provide a steady income for their sister and mother. Had the trustees merely invested appellant's funds in the common stock of the company, as they did their own, and had the company failed, appellant might have had a far more meritorious claim than she now possesses.

The Luria family was closely knit and "old-fashioned" in that the brothers had always looked after the women of the family, and the women had been educated by Max Luria to rely on the men. Also, the younger sons had been instructed to rely on the judgment of the oldest brother, Herbert. The men were aware of their duties to provide income for both their sister, Dorothy, and their mother, Sadie. Appellant acquired a handsome income from the Luria Steel notes, and we agree that her trustees, under the circumstances of this particular case, acted prudently.

More importantly, the hearing court found that appellant had full knowledge and notice of the facts surrounding the purchase of the Luria Steel notes, even though she protested to the contrary. It termed her "an evasive witness" and specifically doubted her testimony. Such matters of credibility are exclusively within the province of the hearing court, and we cannot disturb them on appeal if supported by the evidence.[6]

---

[6] Specifically, the auditing judge gave great weight to the testimony of Dorothy's mother, Sadie Luria, who stated by way of

Additionally, Article XII of the trust pertinently provides: "Each Settlor does hereby expressly declare that the trust which he or she is creating shall be irrevocable but the Trustees may at any time terminate the trust as to any Settlor provided only that such termination shall be by unanimous consent of the Trustees. . . ." Since only the brothers were trustees, they could have circumvented the equality clause of Article I at any time by terminating their respective trusts, which they in fact did in 1950. Appellant challenges their allegedly "secret" dissolutions, but Article XII clearly endows the trustees with the power so to act.

We agree with the auditing judge that in buying the Luria Steel notes the trustees

". . . were motivated by their desire to act in Dorothy's best interest, to safeguard her trust principal and to provide for her an adequate income.

"It was not a case of procuring $90,000 for Luria Steel by unloading company debentures on Dorothy's trust. Luria Steel could have borrowed the same amount from banks at a far lower rate of interest. For the same reason that the executors of Max Luria's will purchased the debentures, the desire and purpose of the brothers was to secure for mother and daughter a six percent return on their money and to continue their interest in the business of the entire Max Luria family, of which they were a part." *Luria Trust*, supra at 764.

Although appellant keeps terming the Luria Steel notes as "high-risk, imprudent investment", it should be remembered that the notes are a debt of the corpo-

---

deposition that in 1945 her son Herbert came to visit her and Dorothy in Ventnor, New Jersey, and told them: "(1) that he and his brothers were investing their funds in the family business, but because he was afraid his mother and sister would lose if it did not succeed, their funds were being invested in government bonds and debentures of the company and (2) that Dorothy was quite satisfied." *Luria Trust*, supra at 766.

ration which have to be paid before the shareholders can participate in any assets of the corporation upon liquidation. The auditing court took notice of the fact that Luria Steel stands ready at any time to redeem the notes completely and the sole reason for delaying redemption past maturity has been due to the uncertainty of the status of the debentures because of this protracted litigation.

### Loan to the Estate of Max Luria

On December 5, 1940, the trustees made a loan of $6,516.67 of appellant's trust funds to the estate of Max Luria, which loan appellant contends amounted to a breach of trust.

Article II of the trust indenture states in part:

"Without in any way intending to limit the general powers of the Trustees, the Trustees herein, or their survivors and successors, are hereby specifically authorized and empowered:

"(a) To lend funds equally from each of the separate trusts to the executors under the will of Max Luria, deceased, with or without security, or to purchase from the executors under the will of Max Luria, deceased, bonds, stocks, real estate or other personal property at such prices as the Trustees may deem reasonable."

We believe the loan was proper under the terms of the trust instrument.

Additionally, as the auditing judge observed, appellant actually benefited from this loan. ". . . [T]he amount of the loans by the trustees for three of her brothers, namely, Mortimer T., Henry T. and I. David Luria, were respectively $16,516.67. The loan by William Luria's trustees was for $10,000 and the loan by the trustees of Herbert B. Luria was for $10,516.66. Had the estate of Max Luria paid interest on the loans

to each of the trusts, appellant would have received $2,713.21 less by way of income from that estate because she shared equally with her five brothers in distribution of income therefrom. The failure of that estate to pay interest to the objector's trust estate therefore gave her a net benefit." *Luria Trust,* supra at 772.

### Loan to Builders Structural Steel Company

Appellant asserts a loan was improperly made to Builders Structural Steel Company, a corporation wholly owned by the trustees (and now known as Luria Steel Supply Corporation). The principal of the loan, together with $5,700.21 worth of interest was repaid on February 27, 1960. Appellant argues that while the interest was at the legal rate of 6%, she was entitled to compound interest instead of the mere simple interest she obtained.

As a matter of policy, we believe appellant's position is the correct view. Section 207 of the Restatement (Second) of Trusts, provides in relevant part:

"(2) Where the trustee is chargeable with interest, he is chargeable with simple and not compound interest, unless (a) he has received compound interest, or (b) he has received a profit which cannot be ascertained but is presumably at least equal to compound interest, or (c) it was his duty to accumulate the income." Comment d on Subsection (2) states: "If the trustee uses trust funds in his own business and it does not appear how much he has earned thereon, he is ordinarily chargeable with compound interest on the ground that he probably received a return from the trust fund so used at least equal to compound interest."

At a time when more is rightly being expected of those in fiduciary positions, we believe the Restatement's view is preferable. However, we are not free to adopt this position. Section 754 of the Fiduciaries

Act of 1949 states: "A personal representative who has committed a breach of duty with respect to estate assets shall, in the discretion of the court, be liable for interest, not exceeding the legal rate on such assets." Act of April 18, 1949, P. L. 512, Art. VII, §754, 20 P.S. §320.754. This section is made equally applicable to trustees and trust funds by Section 983 of the same Act. See Act of April 18, 1949, supra, 20 P.S. §320.983 (11). We therefore conclude the hearing judge's disposition of this issue was proper.

### Conclusion

Having carefully reviewed the considerable record compiled during many years of litigation, we conclude that no prejudicial error exists in the resolution by the orphans' court of the difficult issues presented in this case. Accordingly, the decrees of Orphans' Court Division of the Court of Common Pleas of Philadelphia are affirmed. Each party to pay own costs.

Mr. Justice EAGEN dissents.

Mr. Justice JONES took no part in the consideration or decision of this case.

Mr. Justice COHEN took no part in the decision of this case.