## Shewchuk Estate.

250

Argued April 21, 1971. Before Bell, C. J., Jones, Eagen, O'Brien, Roberts, Pomeroy and Barbieri, JJ.

*James J. Martin,* for appellant.

*Perrin C. Hamilton,* with him *Hamilton, Darmopray, Malloy & Milner,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, October 12, 1971:

We are confronted in this appeal with legal problems generated by the belated reappearance of a long lost daughter four years after the judicially approved distribution of her deceased father's estate to his brother and two sisters. The principal issues involved concern (1) the power of an orphans' court to review and reopen the distribution of a decedent's estate on the ground of fraud and (2) the sufficiency of evidence of fraud in the instant case. We hold that an orphans' court does have such power and that the findings of fraud are adequately supported by the present record.

The procedural history of this appeal is as follows: John Shewchuk died intestate on February 12, 1962, leaving an estate of approximately $150,000. On February 23, 1962, the Register of Wills of Philadelphia granted letters of administration to the decedent's brother and sister, William Shafter and appellant Dorothy Zerkas.

The administrators' account was called for audit in the Orphans' Court Division of the Philadelphia Court of Common Pleas on April 1, 1963, at which time it was revealed that decedent was survived by another sister living in the Ukraine by the name of Maria Arsak. A question also arose at that time as to whether decedent was also survived by a wife and daughter. Appellant and Shafter submitted a signed affidavit admitting the existence at one time of persons known as Pauline and Mary Rogowska but denying any legal relationship of such persons to the deceased. William Henry, counsel for the estate, filed his own affidavit setting forth his belief that decedent had a wife Pauline and a daughter Mary but that they had not been heard from for almost fifty years.

William Shafter died in January of 1964. John Shewchuk's estate was next listed for audit on March 21, 1964, and again on April 9, 1964. On the latter date various witnesses testified that decedent had in fact been married to a Pauline Rogowska and had a daughter by her named Mary. Herbert Davis, a genealogist hired by William Henry on behalf of the estate to search for Pauline and Mary Rogowska, reported to the auditing judge concerning the advertising efforts which had been taken to locate Pauline and Mary.

The matter was next called for audit on December 14, 1964, at which time Davis testified that it was his expert opinion that there was little likelihood of ever finding decedent's wife or daughter. On December 29, 1964, the auditing judge ruled that the decedent's wife Pauline had forfeited her share of the estate by virtue of willful desertion; that decedent's daughter Mary, having been missing for almost fifty years, was presumed to have predeceased her father leaving no issue; and that the estate was therefore to be awarded in equal shares to appellant, to the executrix of William

Shafter, and to the Secretary of Revenue to be held for Maria Arsak under the so-called Iron Curtain Act.[1]

The Schedule of Distribution filed pursuant to this ruling was approved by the orphans' court on April 14, 1965, and distribution of the estate's assets was made accordingly. On May 27, 1966, the administrators and their surety, the Fidelity and Deposit Company of Maryland, were formally discharged from further liability on the bonds of the administrators. In June of 1968, the share which had been given to the Commonwealth for the benefit of Maria Arsak was awarded to her attorney-in-fact and was transmitted by him to Maria Arsak.

On June 30, 1969, appellee Mary Voulgaris filed a petition to open and vacate the distribution decrees of 1964 and 1968 on the ground that she was the decedent's daughter and as such entitled to his entire estate. Preliminary objections pertaining to the petition's lack of specificity were sustained and Mary thereafter filed an amended petition. Answers to the amended petition were timely filed, and extensive hearings were conducted in April and May of 1970 before the same auditing judge. On July 8, 1970, it was decreed that Mary Voulgaris was decedent's daughter and that appellant, as surviving administratrix, was liable to recover the assets previously distributed. Exceptions to the decree were dismissed by the court en banc, and this appeal followed.

Appellee's 1969 petition for review alleged that the original decrees of distribution in 1964 and 1968 had

---

[1] Act of July 28, 1953, P. L. 674, 20 P.S. §1155 et seq. Under the terms of the Iron Curtain Act, if it appeared that an heir would not have actual benefit, use or control of his share of a decedent's estate, his share was to be delivered to the Commonwealth to hold until the heir might show that he could have actual benefit, use or control. The Act was recently held unconstitutional. See *Demczuk's Estate*, 444 Pa. 212, 282 A. 2d 700 (1971).

been procured by the fraudulent misrepresentations of appellant and William Shafter. Appellant contends that even if these allegations be true, a petition for review will not lie once the assets of the estate have actually been distributed in accordance with the terms of a court decree.

Throughout the period of this litigation, Section 721 of the Fiduciaries Act of 1949, P. L. 512, as amended, 20 P.S. §320.721, provided as follows: "If any party in interest shall, within five years after the final confirmation of any account of a personal representative, file a petition to review any part of the account, or of an auditor's report, or of the adjudication, or of any decree of distribution, setting forth specifically alleged errors therein, the Court shall give such relief as equity and justice shall require: *Provided, That this section shall not authorize review as to any property distributed by the personal representative in accordance with a decree of court before the filing of the petition.* . . . (Emphasis added.)[2]

Despite Section 721's apparent categorical prohibition of post-distribution review, it is settled that an orphans' court "enjoys the inherent power to set aside an adjudication at any time upon the showing of fraud." *Alpern v. Girard Trust Corn Exchange Bank,* 403 Pa. 391, 399, 170 A. 2d 87, 91 (1961). This is so even after distribution, for as stated in *White's Estate,* 249 Pa. 115, 94 Atl. 470 (1915) : "Where, however, the fund has been paid out in accordance with the terms of decree, a bill of review will not lie as a matter of right, but only where fraud has been shown to have induced the decree, this latter being an indispensable

_____

[2] By the Act of May 5, 1970, P. L. 336, §4, the proviso of Section 721 was amended to read as follows: "Provided, That no such review shall impose liability on the personal representative as to any property which was distributed by him in accordance with a decree of court before the filing of the petition."

condition. Russell's Admrs. App., 34 Pa. 258. In the case last cited it is said by STRONG, J., 'It was to prevent such injustice that a bill of review is denied after a "balance found due shall have been paid over." The proviso is a protection to the accountant, as truly as to the cestuis que trust. The original decree is presumably right and it would be neither equity nor justice to punish the accountant for yielding obedience to it.' While the review does not lie as a matter of right to correct errors after the fund has been paid out, yet if fraud be shown to have entered into the decree or induced it, notwithstanding the fund has been paid out, the court may, in the exercise of a sound discretion direct a review, Yeager's App., 34 Pa. 173." Id. at 120, 94 Atl. at 472. Cf. *Burger Estate,* 425 Pa. 395, 398, 229 A. 2d 463, 465 (1967). Such review is especially appropriate and necessary in a case such as the present one where the administrators were also beneficiaries. This potential conflict of interest and possibility for self dealing necessitate the closest scrutiny of any allegation of fraud. Cf. *Young v. Kaye,* 443 Pa. 335, 279 A. 2d 759 (1971).

Appellant argues alternatively that even if Section 721 is not an absolute bar to appellee's petition for review, there is insufficient evidence of fraud to justify the granting of appellee's petition. This argument is refuted by the record as accurately summarized in the following portions of the auditing judge's opinion:

"The decedent, John Shewchuk, was born on October 1, 1887, in Kolomja, Galicia, Austria. He emigrated to the United States on the vessel Brandenburg, arriving in New York City on January 3, 1906. . . .

"Early in 1909, he entered into a meretricious relationship with Pauline Rogowska, who was born in 1891 in Eastern Europe. . . . On December 4, 1909, a daughter, Mary, was born of this meretricious relationship. . . . Shortly thereafter, Pauline had decedent arrested

on charges in connection with the conception and birth of this child. He was subsequently released upon his promise to marry Pauline. Thereafter, Pauline, decedent and their child, Mary, lived together in decedent's home at 2304 Wales Street, Philadelphia. Subsequently, on October 5, 1913, decedent and Pauline were married by the Reverend Halaron Yakimowycz in the Ukrainian Catholic Cathedral of the Immaculate Conception, 816 North Franklin Street, Philadelphia. *William Shafter, brother of decedent, was one of the two witnesses whose signature, 'William Shewchuk' (his original name), appears upon the marriage certificate.*

"In or about 1915, Pauline abandoned the home of decedent for some months. *During her absence, Dorothy Zerkas lived in decedent's home and took care of Mary, who was then about six years of age.* In 1916, Pauline returned to the decedent's home. Soon thereafter, Pauline permanently left decedent's home and took their daughter, Mary, with her to New York City, New York. There is some question as to whether she left with another man or subsequently met him in New York. In any event, it is undisputed that shortly after her departure from decedent's home she began to live with that man, and never thereafter returned to decedent's home or communicated with him.

". . .

"Shortly after decedent's death, his sister, Dorothy Zerkas and his brother, William Shafter, went to the office of William C. A. Henry, Esquire, who had represented Dorothy Zerkas in other legal matters. They retained Mr. Henry to represent them in connection with decedent's estate. *Although Dorothy Zerkas and William Shafter knew that they had a sister, Maria Arsak, who lived in the Ukraine, U.S.S.R.; that decedent had married Pauline Rogowska in a church ceremony on October 5, 1913, thereby legitimating their daughter, Mary, born on December 4, 1909; and that*

*his wife had left decedent in 1916, taking their daugh-
ter with her, they deliberately lied to Mr. Henry, stat-
ing that, as brother and sister of decedent they were
his only next of kin, and that decedent had no wife or
child or other relative who had rights equal to, or su-
perior to, their rights under the Intestate Act of 1947,
as amended.* In furtherance of this duplicity, Mrs.
Zerkas, upon the instructions of her brother, William,
when giving the information at the police station requi-
site for the coroner to issue a death certificate, stated
that decedent was unmarried; hence, the death certifi-
cate contains the statement that decedent died 'single'.

"Relying upon the foregoing information supplied
by Mrs. Zerkas and Mr. Shafter, Mr. Henry prepared
a petition for grant of letters of administration, which
averred these facts. This petition . . . was filed with
the Register of Wills of Philadelphia County, on Febru-
ary 23, 1962. Dorothy Zerkas and William Shafter
signed the petition and under oath swore to the truth
of the allegations therein, namely, that they were de-
cedent's only next of kin. This affidavit falsely im-
plied that he was not married and had no children or
other close relatives. Relying upon this petition and
the false, sworn statements appearing therein, the Reg-
ister of Wills issued letters of administration to Doro-
thy Zerkas and William Shafter and required a surety
bond in the amount of $175,000. . . .

"Subsequently, while going through decedent's pa-
pers found in his safe deposit box and his home, Mr.
Henry discovered decedent's naturalization documents,
which clearly revealed that he had a wife and a daugh-
ter. Mr. Henry thereupon confronted the administra-
tors with this information; accused them of fraud and
deceit; told them that he would no longer represent
them; and ordered them to take the estate file out of
his office and to retain other counsel. Shortly there-
after, the administrators returned to Mr. Henry's of-

fice; begged him to continue to represent them in the administration of the estate; promised to reveal the truth to him; and finally persuaded him to continue to represent them. Despite their promise to be truthful, the administrators persisted in their position that there was real doubt that decedent had married Pauline Rogowska; that a child had been born; and, if so, that that child was legitimate. This position is reflected in the affidavits of Dorothy Zerkas and William Shafter, administrators, and filed by them in accordance with Orphans' Court Rule 69.4 and 69.5 (Claimant's Exhibit No. 27), and sworn to under date of March 28, 1963, which aver, inter alia,

" 'WILLIAM SHAFTER, deponent, avers that his deceased Brother, JOHN CHEWCHUK, was never married; that JOHN never introduced any woman to your deponent as his wife, nor did he ever introduce any girl as his daughter;

" 'WILLIAM SHAFTER, deponent, makes his averment even though the decedent, in his application for Naturalization, had stated that he was married and that he had a daughter; . . .

" 'WILLIAM SHAFTER, deponent, avers that his Brother, JOHN, told him on several occasions that he made the statements that he was married because it helped him either to get a job or to hold a job, especially in times of depression; . . .

" 'Deponents firmly believe that there is no Official Marriage Record for JOHN, their deceased brother, and a woman named PAULINE ROGOWSKA, with whom deponents believe the decedent had been living in approximately the year 1908 or 1909;

" 'Deponents believe there is no Birth Certificate for any so-called Daughter, MARY SHEWCHUK; . . .'

"This position is also reflected in the questions contained in the proposed statement of distribution filed by the administrators with this Court at the first call

of their account for audit on April 1, 1963, viz.: '(1) Did the decedent leave surviving him a wife, referred to as Pauline Rogowska, who would be entitled to share in this estate?; (2) Did the decedent leave him surviving a daughter, referred to as Mary Shewchuk, who would be entitled to share in this estate?; and (3) Are William Shafter, Dorothy Zerkas and Maria Arsak the only heirs?'

"Finally, in early January 1964, Mr. Shafter summoned Mr. Henry to his deathbed, and there admitted that he had deceived and lied to Mr. Henry. He then stated, that, in fact, decedent had been married to Pauline Rogowska; that the child, Mary, had been born beforehand; and that Mary had been legitimated by the subsequent marriage, which he had personally witnessed. He then begged deathbed forgiveness of Mr. Henry, stating that he knew he was about to die (and in fact he died within a week, on January 12, 1964).

"Nothwithstanding Mr. Shafter's confession, as late as the recent hearings in 1970, Mrs. Zerkas persisted in casting doubt upon the paternity of Mary, although she admitted that she took care of her while Pauline was away from decedent's home in 1915 during her first separation from decedent." (Emphasis added.)

As the foregoing narrative is supported by ample evidence, we can find no error in the auditing judge's conclusion that "[t]he administrators have been guilty of fraud and deceit from the outset. . . ." A question is raised, however, as to the continuity and effect of the fraud. Appellant asserts that since the misstatements concerning the nonexistence of decedent's wife and daughter had been exposed to the court prior to the original decree of distribution, it was an abuse of discretion to conclude that those decrees were induced by fraud.

In assessing this contention, it is important to bear in mind that "[w]e *will not retry this case.* The ques-

tion for us to consider is, first, whether there is evidence to support the findings of fact and whether the findings of fact support the decree. The court below and the court en banc made a thorough review of all the evidence and arrived at certain findings. If the evidence supports the findings and the findings in turn justify the decree, the decree will not be set aside. . . ." *Pusey's Estate,* 321 Pa. 248, 260, 184 Atl. 844, 849 (1936) (citations omitted). Accord, *Mintz Trust,* 444 Pa. 189, 282 A. 2d 295 (1971); *Rozik v. Monongahela Valley Area Enterprises, Inc.,* 444 Pa. 594, 282 A. 2d 711 (1971). Indeed, deference to the chancellor's findings of fact is especially appropriate in the instant case. The judge who presided over the extensive evidentiary hearings in appellee's petition for review had been the auditing judge in all prior judicial proceedings concerning the estate, and he himself concluded that appellant's fraud had induced him to authorize distribution as he did in 1964 and 1968.

In so concluding, the auditing judge relied principally on (1) the deceitful insistence of William Shafter and appellant at the time of the original decree of distribution that decedent had never been legally married and that he never had a legitimate daughter, (2) the failure of Shafter and appellant to inform their counsel or the genealogist in charge of the search for decedent's daughter that decedent's wife had run away to live with a man named Matthew Christy, and (3) appellant's attempt to bribe the genealogist to testify favorably in her behalf in the 1970 hearings on appellee's petition for review. The first of these three incidents is significant in that it contributed to the auditing judge's decision not to require a refunding bond of the 1964 distributees to protect appellee's interest should she later reappear. The second is important because appellee grew up under the assumed name of Mary Christy, yet none of the advertising efforts made

in an attempt to locate her prior to 1964 mentioned the name Christy. And the third demonstrates appellant's continuing bad faith and thus raises a serious doubt as to her truthfulness during the pre-1964 search for appellee. This evidence is sufficient in sum to support the conclusion of the orphans' court that its original distribution decrees had been infected by fraud.[3]

In addition to the preceding contentions, appellant claims that the orphans' court erred in not applying the equitable doctrines of unclean hands and laches, in concluding that due process required that appellee's petition for review be granted, and in denying appellant's discovery petition. We are unpersuaded.

The record discloses that appellee had previously stated under oath in Connecticut probate proceedings in the estate of Matthew Christy that she was Christy's daughter and that her mother, Pauline Rogowska, was Christy's wife. The orphans' court found that these prior inconsistent statements had not been made for any selfish motive of personal gain and that appellee neither sought nor gained any portion of Christy's estate. In these circumstances there was no error in failing to bar appellee's petition on the ground of unclean hands.

In arguing that appellee is guilty of laches, appellant asserts that appellee failed to exercise due diligence to attempt to locate or contact her father between 1962 and 1969 when she had reason to believe that he

---

[3] The record is not entirely clear concerning appellant's prior knowledge of the name of Christy and her attempt to bribe the genealogist. Appellant now claims that she heard the name Christy only one week prior to appellee's 1969 petition for review and that she merely promised to compensate the genealogist as an expert witness which promise was misconstrued by the court. The record is certainly susceptible of these innocent interpretations. The auditing judge, however, had a full opportunity to observe the witnesses at first hand, and we cannot conclude his interpretation of these events was clearly erroneous.

was either dead or of an advanced age. In contrast to decedent's wife whose willful desertion of decedent effected a forfeiture of her share of decedent's estate, appellee as decedent's daughter was under no legal duty to keep in touch with her father. The petition for review was filed within the five-year limitations period prescribed for such actions by Section 721 of the Fiduciaries Act of 1949. That being so, we cannot conclude on this record that the orphans' court abused its discretion in rejecting the defense of laches.

We need not presently consider the constitutional issue raised by appellant. In the course of his opinion in support of the granting of appellee's petition for review, the auditing judge suggested that appellee had been deprived of property without due process of law by virtue of the failure of the orphans' court to have required a refunding bond from appellant and the other original distributees as a condition of the original decrees of distribution. However, even if this conclusion be erroneous, such error would be inconsequential; as set out above, the court's exercise of discretion in granting appellee's petition for review is adequately and independently supported by evidence of fraud.

Finally, we perceive no error in the auditing judge's denial of appellant's petition for discovery. Having carefully reviewed the record, we agree with the finding of the court en banc that appellant was afforded ample opportunity to prepare her defense against appellee's petition.

Aside from the merits, appellant asks this Court, in the event her appeal is unsuccessful, to direct that she be removed as administratrix and a nominee of appellee appointed in her stead. The orphans' court decreed that appellant was "liable to recover the entire balance of principal and income" awarded under the previous distribution decrees. Under Section 721 of the Fiduciaries Act, the orphans' court possesses broad power to

"give such relief as equity and justice shall require." This power was not abused in this particular aspect of the court's decree.

The decree of the Philadelphia Court of Common Pleas, Orphans' Court Division, is affirmed. Appellant to pay costs.