## MacCarthy Estate

*Richard M. Gillis, Jr.,* for accountant.

*Harry E. Brodsky, Alexander Brodsky* and *William F. Zinger,* for claimants.

*Marvin I. Block* and *Lawrence Barth,* for Commonwealth.

*John M. Libonati* and *Robert W. Chronister,* for United States.

BRUNO, *J.,* June 1, 1979—Elmer MacCarthy died on March 16, 1975, intestate and without known heirs. Letters of Administration were granted to Michael J. McAllister by the Register of Wills of Philadelphia County on June 4, 1975. Proof

of the advertisement of the grant of the letters was submitted and is annexed.

Marvin I. Block, Esq. entered an appearance for the Commonwealth as its interests may appear.

It was originally thought by counsel for the accountant that decedent was survived by 11 first cousins once removed on the paternal side. It was submitted that these 11 people were all grandchildren of decedent's paternal aunt, Isabella MacCarthy, by her husband, Alexander Wilson. However, as a result of further investigations by Herbert U. Davis of Gwirtz-Davis Genealogical Service, it was discovered that four of these presumed next of kin, viz., James Messick, Roland Messick, Harry Messick and Jessie Messick, are descendants of Alexander Wilson by his first wife, Mary, and not by his second wife, Isabella, nee MacCarthy. As a consequence, the "Messicks" are not related to decedent.

However, it is submitted that the seven remaining people, viz., Isabella Edington, Ruth Mayne, Jean Graf, Richard Woodrow Wilson, Dorothy Carbonara, John Wesley Wilson and Marjorie Dreyer, are descendants of Isabella MacCarthy and Alexander Wilson and are decedent's first cousins once removed on the paternal side.

During the course of the first hearing it became apparent to the court that no evidence of next of kin on the maternal side was being produced. As a consequence, the court continued the matter generally and suggested to the accountant that further efforts be made to locate and identify heirs on the maternal side.

Sometime thereafter, the matter was listed for a second hearing at which time the results of the continued investigation were submitted to the court.

Since it was already known that decedent's mother, Sarah MacCarthy, nee Wilkinson, was the child of Robert Wilkinson and Margaret Ganley, advertisements were placed in the Philadelphia Daily News, The Philadelphia Inquirer and The Philadelphia Bulletin seeking relatives of any of the above-named people. No positive responses were elicited by those advertisements.

Because decedent's father, David MacCarthy, was born in Belfast, Northern Ireland, it was thought by the accountant that decedent's father might have married Sarah Wilkinson in Belfast. Accordingly, Professor Desmond S. Greer, Esq. of the Law Faculty of the Queen's University of Belfast, Northern Ireland, was retained to place advertisements in local newspapers, to screen responses to the advertisements, and to take other appropriate steps in an effort to locate and identify any maternal heirs. Professor Greer placed advertisements seeking relatives of Sarah Wilkinson, Robert Wilkinson and Margaret Ganley in The Belfast Telegraph, The Sunday Times, The Irish News and The Belfast Newsletter. Two relevant responses were forthcoming.

A baptismal record of a "Robert Wilkinson" was sent to Professor Greer by a James Wilkinson, who said that "Robert Wilkinson" was a cousin of his grandfather. The document stated that "Robert Wilkinson" was baptized on January 20, 1825 at The Second Portglenone Presbyterian Church. However, James Wilkinson submitted no evidence that his "Robert Wilkinson" married Margaret Ganley or was the father of Sarah MacCarthy, nee Wilkinson. Further, since Sarah was born in 1844 this "Robert Wilkinson" would have been only 19 at her birth, Professor Greer concluded that it is highly

unlikely that this "Robert Wilkinson" is decedent's grandfather given the custom in nineteenth century Ireland of marrying at an older age.

Another response came from T.F. MacCarthy-Maguire who was unable to provide any information concerning the maternal side. He stated that he was related to a Daniel MacCarthy, who emigrated from Ireland to the United States in the 1860's and served in the Civil War. However, he offered no documentary proof of that relationship and offered no proof that "Daniel" was related to this MacCarthy family. Indeed, Professor Greer reported that it was unlikely that T.F. MacCarthy-Maguire was related to decedent since Mr. MacCarthy-Maguire's ancestors were Catholics and this MacCarthy family were Protestants.

Professor Greer also reported that he attempted to locate a certain Protestant Church near Belfast in an effort to locate baptismal records of Sarah Wilkinson, but the search for the church proved fruitless.

As a result of his extensive investigations, Professor Greer reported to the accountant that he exhausted all possible avenues of discovery and concluded that any additional efforts to locate maternal heirs would be fruitless. Mr. Davis, the genealogist, testified that he reviewed Professor Greer's investigations and stated that he endorsed the Professor's conclusions.

The court has carefully reviewed all of the testimony and all of the documentary evidence and finds that Elmer MacCarthy was survived by the following first cousins once removed on the paternal side, viz., Isabella Edington, Ruth Mayne, Jean Graf, Richard Woodrow Wilson, Dorothy Carbonara, John Wesley Wilson and Marjorie Dreyer. The

court also finds that everything humanly possible has been done to ascertain the identity of heirs on the maternal side.

Counsel, both for the accountant and for the heirs at law, suggest that the court award the balances of principal and income shown in the account to the above-named heirs at law and next of kin of Elmer MacCarthy.

The Commonwealth of Pennsylvania requests that the funds be awarded to the clerk of the orphans' court division without prejudice to the right of the Commonwealth to proceed against the fund at some future time.

The United States of America requests that the funds be awarded to it pursuant to the Act of September 2, 1958, 72 Stat. 1259, as amended, 38 U.S.C.A. §5220(a), since decedent died while a patient at the Veterans Administration Hospital, Coatesville, Pa. That statute provides that the personal property of a veteran who dies intestate while a patient in a Veterans Administration hospital or facility to which he was admitted as a veteran and who is not survived by a spouse, next of kin or heirs entitled to his personal property under the laws of his domicile "[s]hall immediately vest in and become the property of the United States as trustee for the sole use and benefit of the General Post Fund. . . ."

Both sovereigns would have distribution withheld from the first cousins once removed because they claim that the first cousins once removed did not meet their burden of proof. They perceive the law of this Commonwealth to be that a person claiming under the intestate laws must prove not only his relationship to decedent but also that there are no persons having a closer degree of consan-

guinity to decedent. More specifically, they assert that these first cousins once removed, being on the paternal side, must prove the nonexistence of heirs at law and next of kin on the maternal side before they are entitled to distribution.

This view of the law is based on language found in Bokey Estate, 412 Pa. 244, 194 A. 2d 194 (1963), wherein our Supreme Court found that an alleged sister and alleged first cousin of a decedent did not prove their kinship to decedent. In discussing the first cousin's claim the court stated, at 250: "It was [incumbent] upon Boki to prove (1) that he was a first cousin, (2) at the time of his death, decedent was survived by neither brothers, sisters or their issue and (3) . . . except for Boki decedent was survived by neither uncles, aunts, their children, or grandchildren." This statement was later endorsed in Krepinevich Estate, 433 Pa. 78, 248 A. 2d 844 (1969).

However, the decision in Bokey Estate, supra, was based on a finding that the alleged first cousin did not prove his relationship to the decedent; therefore, items (2) and (3) above are dictum. Regardless of that, however, the Commonwealth's and the United States' perception of the law cannot be upheld.

If this court were to adopt the two sovereigns' position, it would be placing a crushing burden upon the claimants. Anyone with the slightest familiarity with cases like this is acutely aware of the difficulties inherent in proving kinship to someone now dead who was not a member of the immediate family. The Commonwealth and the United States seek to increase these difficulties a hundredfold.

Forcing someone to prove a negative—i.e., the nonexistence of someone else—borders on the ab-

surd. It may be a stimulating intellectual exercise for a sophomore logic class, but it has no place in a court of law in which justice is sought.

This court will not demand the impossible. A professional genealogist has testified, and, more importantly, the court has found as a fact that nothing more can be done to prove the existence or nonexistence of heirs on the maternal side of decedent's family. The effect of the Commonwealth's and the United States' position, were the court to accept it, would be to deny these claimants, whom I have found to be decedent's only next of kin on the paternal side, any possibility of ever succeeding to an interest in decedent's property. That result grossly offends all notions of fundamental fairness.

Furthermore, the court is of the opinion that neither the Commonwealth nor the United States is any longer a party to these proceedings. It is clear that the Commonwealth has an interest in an estate where the decedent dies intestate and without known heirs. It is equally clear that the United States has an interest in the personal property of a decedent who dies intestate and without known heirs in a Veterans Administration hospital to which decedent was admitted as a veteran. However, once kinship has been found as a fact by a court of competent jurisdiction, the contest for distribution is between the known heirs and the unknown heirs. At that moment the interests of the sovereigns disappear and they have no standing to demand proof from anyone.

The court is well aware that prior cases assumed that the Commonwealth always has an interest and is always in a position to demand that a claimant establish that no one stands closer to the decedent on both the maternal and paternal sides, even

where the claimant's kinship has been established. See, e.g., Krepinevich Estate, supra, and Krazukowski Estate, 25 Fiduc. Rep. 101 (1974). While not expressly articulated in the cases, the concept is apparently a remnant of the ancient common law wherein estates in land were for life only and reverted to the overlord upon the death of the feudatory, the ultimate overlord being the sovereign himself. The historical residue of this hoary feudal doctrine can be seen in Link's Estate (No. 1), 319 Pa. 513, 516, 517, 180 Atl. 1 (1935), wherein the court stated:

"It is only by the grace of the Commonwealth that heirs or legatees are permitted to receive any benefit from a decedent's toil and energy. But it reserves to itself the right, as it always has, to take the property of a decedent when under its laws there is no one in a position to inherit. The property of an intestate decedent who dies without known heirs is not mere flotsam or jetsam to be taken by anyone claiming it. In such circumstances, the Commonwealth stands in relation to the property of the decedent as one asserting a substantial right thereto. The Commonwealth's claim is not based on charity, gratuity, or an unearned benefit; it was by its protection that it was possible for the decedent to acquire such accumulation of property as he possessed."

It is difficult to understand what purpose such ideas serve in the modern world, especially where heirs have been located. This is not a feudal society. Fealty is no longer sworn to the overlord. Knight's service or other such incidents of tenure are no longer required. The doctrine is as anachronistic as benefit of clergy or trial by ordeal. It should be dis-

carded. At the end of the last century, Justice Holmes stated in The Path of the Law, 10 Harv. L. Rev. 457, 469 (1897), that: "It is revolting to have no better reason for a rule of law than that it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

Therefore, because decedent was survived by seven first cousins once removed on the paternal side and because all possible efforts have been made to locate heirs on the maternal side, I find that the Commonwealth no longer has any interest in these proceedings.

Accordingly, the court will award the fund to the seven first cousins once removed. This effectively precludes the United States from pursuing its claim since decedent has been found to have died survived by heirs who are entitled to distribution of his estate under the laws of his domicile. Therefore, the claim of the United States is dismissed.

• • •

The above awards are also subject to the above-named distributees filing refunding bonds with the clerk of the orphans' court division.

### ORDER

And now, June 1, 1979, the account is confirmed nisi.

### OPINION SUR EXCEPTIONS TO ADJUDICATION

KLEIN, *C.J., Specially Presiding*, May 28, 1980—Elmer MacCarthy, a United States veteran, died March 16, 1975, intestate, unmarried and

without issue, in the Veterans Administration Hospital, Coatesville, Pa. Letters of administration were issued to Michael J. McAllister on June 4, 1975.

Because considerable doubt existed as to whether the decedent was survived by any next of kin, the administrator engaged a professional genealogist to make an investigation to determine whether there were any surviving relatives. As a result of this investigation, Judge Bruno, the Auditing Judge, was satisfied that decedent was survived by seven first cousins once removed, on the paternal side.

During the course of the first audit hearing, Judge Bruno noted that no evidence was offered with respect to possible surviving relatives on the maternal side. Accordingly, he continued the audit with directions to the administrator to make further investigation to locate possible maternal heirs. A comprehensive investigation for this purpose was made but was unsuccessful in locating any maternal next of kin. The Auditing Judge concluded "that everything humanly possible has been done to ascertain the identity of heirs on the maternal side" and found as a fact that the decedent was survived by the seven paternal first cousins once removed. Accordingly, he awarded the estate to them as surviving next of kin under the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. § 2101 et seq., subject to their filing refunding bonds with the court.

Exceptions to the adjudication were filed by the United States Veterans Administration and the Commonwealth of Pennsylvania.

The United States claims the balance in the estate by virtue of the Act of September 2, 1958, 72

Stat. 1259, as amended, 38 U.S.C.A. §§5220-5226. This statute provides that the personal property of a veteran who dies intestate while a patient in a Veterans Administration hospital or facility, to which he has been admitted as a veteran, and is not survived by a spouse, next of kin or heirs entitled to his personal property under the laws of his domicile, ". . . shall immediately vest in and become the property of the United States as trustee for the sole use and benefit of the General Post Fund. . . ." 38 U.S.C.A. §5220(a). The position of the United States is that the paternal heirs have not established their entitlement to MacCarthy's estate under the laws of his domicile, i.e., the Commonwealth of Pennsylvania.

The Commonwealth, on the other hand, maintains that a final determination as to heirship has not occurred and that the fund should not be awarded to the United States but that it should be paid over to the clerk of the orphans' court without prejudice to the Commonwealth to proceed against such funds in the future.

In our opinion, the exceptions of both the United States and the Commonwealth of Pennsylvania are without merit.

We are confronted with a situation which occurs frequently in probate proceedings where the heirs on one side of the family of an intestate decedent are definitely identified and located but, despite an extensive and diligent search, it is impossible to find any heirs on the other side of the family.

Both the Federal and state governments predicate their positions in a large measure upon the language found in Link's Estate (No. 1), 319 Pa. 513, 180 Atl. 1 (1935), in which the claims of the alleged next of kin were rejected by the court and

the estate awarded to the Commonwealth. Mr. Justice Kephart (later Chief Justice) said, at p. 522-523:

". . . The evidence to sustain relationship must bear on every material feature necessary to support a finding of kinship. It must be grounded on a reasonable certainty and come from witnesses whose truth and candor are not questioned. *To defeat the claim of the Commonwealth* the *evidence must be so clear, precise and definite in quality and quantity as to satisfy the court below that the relationship claimed existed.*" (Emphasis supplied.)

The factual situation in Link's Estate is markedly different from that existing in the instant case. In Link, the alleged next of kin were unable to satisfy the court that they were related to decedent, whereas in our case it has been established beyond reasonable question that decedent was survived by seven first cousins once removed. Since decedent was survived by next of kin, the United States, as trustee for the General Post Fund, and the Commonwealth of Pennsylvania are both eliminated as claimants. Neither of them has any valid claim to the funds in this estate. The competition here is not between next of kin and a sovereign state; it is between identified next of kin and unidentified next of kin, if any there be. The only impediment to the claims of the paternal next of kin is the possible existence of other relatives of the decedent who stand in the same or closer relationship to him.

The rule of Link's Estate is clearly applicable when the sovereign state is making claim to the estate of a decedent who was not survived by heirs. However, it has no application where, as here, the existence of surviving heirs has been clearly estab-

lished. For example, in Demczuk Estate, 444 Pa. 212, 218, 282 A. 2d 700 (1971), where the decedent died testate, leaving his estate to a son whose identity was in question, the court rejected the rule in Link's Estate and said: "'Clear, precise and definite' evidence is an entirely proper standard in a case of intestacy to prove that a particular heir or class of heirs existed. Yet, this same standard is inappropriate where the existence of an heir is uncontested, and only claimant's identity as the heir is at issue."

In the instant case, since the identity of some of the heirs has been clearly established, in our opinion their burden to prove that there are no other next of kin whose claims are equal to or superior to their own is only by a fair preponderance of trustworthy and satisfying evidence and no more. See Bokey Estate, 412 Pa. 244, 194 A. 2d 194 (1963); Davis Estate, 365 Pa. 605, 76 A. 2d 643 (1950); Link's Estate, supra, at 516; Rhodes and Hannebauer Estates, 71 D. & C. 330 (1950). The auditing judge found that the paternal heirs met their burden of proof. We agree.

The determination of the existence and identity of intestate next of kin is a question of fact like any other factual question submitted at an audit of a decedent's estate. Findings of fact by an auditing judge, like the verdict of a jury, will not be disturbed unless clear error be shown. If there be sufficient evidence to support such findings and they are not predicated upon capricious disbelief of competent and credible evidence they will stand. To justify a reversal, there must be manifest error or inferences and conclusions clearly unwarranted. This rule applies where the court en banc, as here, is passing upon exceptions to the findings of an auditing

judge: Roberts Estate, 350 Pa. 467, 39 A. 2d 592. (1944); Spear Estate, 27 D. & C. 2d 51 (1962); Funk Estate, 22 Fiduc. Rep. 690 (1972). It also applies where the matter is being reviewed by an appellate court: Kasula Estate, 456 Pa. 62, 318 A. 2d 338 (1974); Shewchuk Estate, 444 Pa. 249, 282 A. 2d 307 (1971); Mintz Trust, 444 Pa. 189, 196, 282 A. 2d 295 (1971); Krepinevich Estate, 433 Pa. 78, 248 A. 2d (1969); Pavlinko Estate, 399 Pa. 536, 160 A. 2d 554 (1960); Garrett Estate, 371 Pa. 284, 89 A. 2d 531 (1952).

We are satisfied that the accountant has exhausted all possible avenues of discovery and that any additional efforts to locate maternal heirs would be fruitless and would not justify the substantial expenditure which would be involved. The conclusion of the auditing judge "that everything humanly possible has been done to ascertain the identity of heirs on the maternal side" is fully supported by the evidence.

The claimants are not required to prove the nonexistence of heirs on the maternal side or next of kin more closely related to decedent to an absolute certainty or beyond a shadow of a doubt, as the exceptants appear to suggest. To accept such an absolute and harsh rule would, in many cases, result in depriving heirs who have clearly established their claims from ever receiving their proper inheritances. Ordinary fairness and common sense negate the acceptance of such an inflexible rule. Judge Bruno succinctly stated the same principle in his adjudication: "Forcing someone to prove a negative—i.e., the nonexistence of someone else —borders on the absurd."

We ask for whose benefit should such a strict rule

be invoked. Certainly not for the United States or the Commonwealth of Pennsylvania in this case because they are eliminated by paternal heirs whose existence has been established to a reasonable certainty. The only persons who could benefit are relatives who may not know of the previous existence of decedent or of his death. More than five years have elapsed since Elmer MacCarthy died. In that period no maternal heir has come forward and presented any claim. Moreover, a thorough and intensive investigation has failed to establish their existence. If located they could clearly be characterized as "Laughing Heirs" who had so little interest in decedent and so little contact with him that they did not concern themselves for many years as to whether he was living or dead. How much more is owing to them beyond insisting that a careful and extended search be made for them as Judge Bruno directed in this case?*

If such relatives actually are in existence, Judge Bruno has protected their interests, as much as is practically feasible, by making the awards to the paternal heirs conditioned upon their filing refunding bonds with the clerk of the court. If maternal heirs should come forward in the future, they could take appropriate action against the paternal distributees.

Accordingly, the exceptions of the United States and the Commonwealth of Pennsylvania are all dismissed and the adjudication is confirmed absolutely.

---

*For an interesting discussion of this question, see the chapter entitled The Laughing Heir—Should Remote Relatives Be Allowed To Inherit, Rheinstein and Glendon, Decedents' Estates 36 (1971).

## OPINION SUR EXCEPTIONS TO ADJUDICATION

PAWELEC, *A.J.*, *Dissenting*, May 28, 1980—I agree that neither the Veterans Administration nor the Commonwealth has any further interest in these funds once the court is satisfied as to the existence and identity of heirs who are entitled to take under our intestate statutes. However, I do not believe that a distribution of these seven first cousins once removed on the paternal side is proper under the present state of the law.

In Krepinevich Estate, 433 Pa. 78, 248 A. 2d 844 (1969), the Supreme Court specifically placed the burden on the wife claimant of proving the non-existence or nonsurvival of other intestate heirs before she could receive the entire estate. This case has never been overruled. In the instant case there has been no proof as to the existence or non-existence of the possible heirs on the maternal side.

Accordingly, I must dissent to the award of the estate to the seven first cousins once removed.

## DECREE

And now, May 28, 1980, the exceptions of the United States and the Commonwealth of Pennsylvania are dismissed and the adjudication is confirmed absolutely.