Estate of Murphy: Klenert and others, Appellants, vs. McElroy and others, Respondents.

*February 6—March 5, 1935.*

For the appellants there were briefs by *Grady, Farnsworth & Walker* of Portage, and oral argument by *Walter H. Farnsworth.*

For the respondents there was a brief by *Rogers & Owens,* attorneys, and *Phillip Owens,* guardian *ad litem,* all of Portage, and oral argument by *Phillip Owens.*

MARTIN, J. John J. Murphy died December 19, 1933, at the age of seventy-five years, leaving as his heirs three brothers, Charles, Edward, and Peter V., a sister, Julia McElroy, also Andrew, a child of his deceased brother James, and four children of a deceased sister. On March 21, 1932, decedent executed a will in due form. The county court has so found. After the payment of debts and a small bequest, he thereby gave the residue of his estate, both real and personal, to his brother Peter V. Murphy and to Peter's three sons, William, Edward, and Charles, in equal shares. Paragraph 5 of said will provides:

"In making this, my last will and testament, I have taken into consideration all of my heirs at law, and it is my will, and I direct, that no heir not mentioned in this, my last will and testament, take any of my estate."

There is considerable evidence in the record to the effect that such disposition of his property was in accord with his intent and desire as expressed by him both before and after the execution of such will.

The deceased left an estate of about $9,000, and an indebtedness of about $2,000. He had served on the Chicago police force for about twenty-three years, from which service he retired in 1915, at which time he purchased from his sister Julia a farm in Columbia county, and from 1921 to 1930 or 1931 he lived on this farm with his brother James. He had never married. After leaving the farm in the early spring of 1931, he lived for a time at the home of his sister Julia, and

later took up his residence at a hotel in the city of Portage, where he resided until in the fall of 1932, at which time, because of an injury, he went to the hospital where he remained but a short time. Upon leaving the hospital, he returned to the home of his sister, and thereafter made his home with said sister until the fore part of September, 1933, when he again returned to the hospital. On this occasion he remained in the hospital about six weeks. It appears that the deceased had left his will for a time with T. C. Hanley, a friend, in a sealed envelope for safe-keeping, and that he got the will back from Mr. Hanley some time during August, 1933.

On October 2, 1933, the sister Julia McElroy petitioned the county court of Columbia county for the appointment of herself or some other suitable person as guardian of the person and estate of said decedent. That said petition is verified and, in part, states:

"That said John J. Murphy is now seventy-five years of age or more, and weakened mentally and physically by disease; is unable to take care of himself and incapable of understanding the nature and effect of his acts, or to preserve and look after his property, and by reason of such condition the said John J. Murphy is mentally incompetent to have the charge and management of his property."

On October 25, 1933, said county court made an order appointing T. C. Hanley of Portage as guardian of the person and estate of said decedent. The order so appointing said guardian, in part, states:

"And said county court having found that said John J. Murphy is incompetent by reason of his advanced age and weakened mental and physical condition caused by disease, and that he is incapable of understanding the nature and effect of his acts, or to preserve his property as alleged in said petition. . . ."

At the hearing in the county court many witnesses testified relative to the mental and physical condition of the deceased during the summer and fall of 1933, and in particular cover-

ing the period from the destruction of deceased's will until his death. This testimony discloses that at times the decedent was violent and had to be restrained in bed. His mental condition varied from time to time; they had considerable trouble keeping him in bed at the hospital; there were days when he was violent; his mind would wander, and he seemed to be nervous. He had rational moments, but was irrational much of the time. Upon leaving the hospital in October, 1933, the decedent occupied rented rooms in a residence near the hospital so that he would be near the doctor. He stayed there until some time in November, at which time he went to Chicago, and there lived with his brother Peter until his death.

The sister Julia McElroy, John A. Scott, Jane S. Karel, Henry Scott, and Andrew James Murphy, interested heirs at law, filed objections in the county court to the probate of the lost or destroyed will of the deceased. The grounds of their objections are that, if there was such an alleged will, deceased was incompetent at the time of its execution; that the alleged instrument was not executed in the manner required by law, and that the execution of such alleged instrument was procured by the exercise of undue influence upon said deceased, and, further, that if a valid will was at any time executed by deceased, it was revoked and destroyed by him.

On the issues thus made and the petition for the appointment of an administrator, the county court on June 12, 1934, filed its decision and made findings of fact and conclusions of law. In its findings of fact the court found:

"That on or about March 21, 1932, said John J. Murphy executed an instrument as his last will and testament, a copy of which was attached to the petition filed for the probate thereof as a lost or destroyed will; that such will was signed by him in the presence of two adult persons, who in his presence and in the presence of each other affixed their names thereto as attesting witnesses; that at the time of the execution of said will said John J. Murphy was of sound mind and

competent to execute such will; that in the late spring or early summer of 1933 such will was destroyed by Julia E. Mc-Elroy, sister of said decedent."

The court further found that said decedent knew of the destruction of such will at the time same was destroyed; that at the time of such destruction, and for a substantial period thereafter, said deceased was competent to execute a new will and had full opportunity to make and execute another will, but that he did not make or attempt to make another will. As conclusions of law the court found "that John J. Murphy, by his conduct, consented to the destruction of his will and thereby revoked such will." The court further found that deceased died intestate, and that the court has jurisdiction to administer his estate as intestate property.

Evidently the county court assumed that the instant case was controlled by the holding of this court in *Parsons v. Balson,* 129 Wis. 311, 109 N. W. 136. In its decision the trial court said:

"I am of the opinion that the rule of *Parsons v. Balson,* 129 Wis. 311, 109 N. W. 136, controls in this case, and that by his failure to consult his lawyer to re-execute his will, and his absence of rancor in announcing the destruction, it is but reasonable to assume that it was his purpose to assume and ratify the destruction."

We cannot agree with the county court that this case is ruled by the holding in *Parsons v. Balson, supra,* nor do we find any similarity of facts. The Parsons will made on June 15, 1876, was kept in a tin box, which box and its contents were on the 5th day of April, 1887, destroyed by a fire which burned the residence of said Parsons. After destruction of the will, and on the 10th of November, 1887, Parsons and his wife adopted a child. Mr. Parsons died on July 22, 1890, without having executed any other will. More than three years had elapsed between the destruction of this will and the death of Mr. Parsons. A child had been adopted in

the meantime. There was no question as to his mental condition. The destruction of the will was accidental. In that case this court said:

"In the case before us there is nothing to rebut the presumption of revocation. The destruction of the will three years before the testator's death, with his knowledge, together with the adoption of Lafayette R. Parsons after such destruction, revoked the will; hence there was no will which could have been admitted to probate as a lost or destroyed will."

Sec. 238.14, Stats., relative to revocation of wills, so far as material, provides:

"No will nor any part thereof shall be revoked unless by burning, tearing, canceling or obliterating the same, *with the intention of revoking it,* by the testator or by some person in his presence *and by his direction,* or by some other will or codicil in writing, executed as prescribed in this chapter, or by some other writing, signed, attested and subscribed in the manner provided in this chapter for the execution of a will; excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator. . . ."

This statute specifically provides how a will may be revoked. Whatever method may be followed as provided by the statute must be with the intent of revoking the will, even though the act be performed by the testator, or if done by another, it must be so done in the presence and by the direction of said testator. In either event, the statute requires affirmative action by the testator, the only exception being that nothing contained in the statute shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator. The revocation implied by law results from subsequent changes in the condition or circumstances of the testator.

In the *Parsons v. Balson Case, supra,* this court did not hold that the destruction of the will three years before the

testator's death, with his knowledge, operated to revoke the will. The language of the court is:

"The destruction of the will three years before the testator's death, with his knowledge *together with the adoption* of Lafayette R. Parsons, after such destruction, revoked the will."

In the instant case, the will was not destroyed in the presence of the testator and by his direction. While Julia E. McElroy, the sister of deceased, vigorously denied that she had destroyed the will, the county court has found the fact to be that she did destroy the testator's will of March 21, 1932. It does not appear by what means the deceased learned that the will had been destroyed. However, it does appear that Mrs. McElroy told different persons, "That John had destroyed the will." The trial court was unable to find as to the date on which the will was destroyed. The court did find that it was some time in the late spring or early summer of 1933. However, it appears that the will was for a time in the possession of Mr. T. C. Hanley, of Portage, in a sealed envelope for safe-keeping, and that the deceased withdrew the will from Mr. Hanley's possession about a month before the deceased went to the hospital in the fall of 1933, and it appears to be a conceded fact that the deceased entered the hospital the fore part of September, 1933. These dates are significant, in connection with considering the mental and physical condition of the deceased during the summer and fall months of 1933 as disclosed by all the testimony. As a conclusion of law the county court found:

"That John J. Murphy, by his conduct, consented to the destruction of his will and thereby revoked such will."

In other words, the deceased had learned through some channel, rumor, or otherwise, some four or five months before he died, that his sister had destroyed his will, and, in

his weakened condition, mentally and physically, his failure to protest the destruction of his will, his failure to call a lawyer to execute a new will, his silence for the short intervening time between the destruction of his will and his death, is the basis for the conclusion of law that by his conduct he had consented to the destruction of his will and thereby revoked such will.

We cannot approve such conclusion of law as being applicable to this case. In Underhill, Wills, p. 308, § 225, the rule is stated thus:

"If the will is destroyed without the consent of the testator, the act of destruction may be a valid revocation if it is ratified by him subsequently. But the ratification must be evidenced by some act from which the court may with reason infer that the original act of destruction was approved by the testator. Mere silence on the part of the testator or a refusal to make a new will is not enough alone from which to imply a ratification."

In Page, Wills (2d ed.), p. 675, § 427, discussing adoption of unauthorized act of destruction, the author says:

"If the will is destroyed, mutilated, and the like, without testator's authority, either by a third person, or by some cause other than by human agency, and testator subsequently adopts such act *and declares that he intends that such will shall be revoked,* a question has been presented on which there is a conflict of authority. In some jurisdictions it is held that testator's adoption or ratification of such act amounts to a revocation. In other cases, it is held that testator cannot adopt such unauthorized act so that it will amount to a revocation. Under a statute such as the Statute of Frauds, or the Statute of Victoria, which requires testator's intention to revoke, to be expressed by some act manifest on the will, or by a subsequent will, codicil, and the like, it would seem impossible to revoke a will by a subsequent ratification of an act which was done without testator's authority. When the act was done, it did not operate as a revocation. *To hold that the subsequent ratification makes such act amount to a revo-*

*cation, is to ignore the provisions of such statutes, and to revoke the will by testator's subsequent oral declarations."*

In Schouler, Wills (6th ed.), p. 667, § 587, the author says:

"Inasmuch as revocation involves intention, the inference arises that the physical act must be performed by the testator himself or under his sanction and direction. . . . Both presence and direction of the testator being usually essential where the act is performed by another, a will is not legally revoked, though destroyed by the testator's own order, if burned or torn where he did not or could not see or take cognizance of the deed done, as statutes commonly require the revocation by physical act to be by testator himself or in his presence and in such states cancellation by a third party out of the presence of testator is of no effect, but in other states destruction by direction of the testator outside of his presence may be effective. The local statute must determine whether both presence and direction are here indispensable."

In 28 R. C. L. p. 168, § 124, it is stated:

"Revocation is an act of the mind demonstrated by some outward and visible sign or symbol of revocation, and it is universally the custom to require some overt act in order to constitute revocation."

The respondents contend that the will was procured by undue influence exercised on testator by Peter V. Murphy in favor of himself and his children, and they seek a review of so much of the order appealed from as fails to find that the will was the result, in the first instance, of undue influence exercised on the testator by said Peter V. Murphy. That issue was before the county court. We fail to find any evidence in the record to sustain the contention, and we so interpret the finding of the county court that the will as executed on March 21, 1932, was the will of the deceased, duly executed, and that at said time the deceased was of sound mind and competent to execute said will. The county court in fact sustained the will, but erroneously concluded as a matter of law that the deceased by his conduct consented to the destruc-

tion of his will and thereby revoked same. The orders appealed from must be reversed.

*By the Court.*—The orders appealed from are reversed, and the record remanded with directions to admit to probate the last will and testament of the deceased, dated March 21, 1932, and to vacate and set aside the order and judgment adjudging deceased died intestate, and appointing an administrator of his estate.