## McCaffrey Estate

Before Klein, A. J., Lefever, Saylor, Shoyer, Pawelec and Silverstein, JJ.

*Walter B. Gibbons, George S. Forde, Jr.* and *James E. Gallagher, Jr.,* for exceptants.

*James R. Caiola* and *Harry N. Moran, Jr.,* contra.

LEFEVER, J., August 17, 1972.—There is no need to repeat in detail the history and facts in this protracted litigation[1] because they are fully set forth in the opinion of Judge Silverstein. The issue before us is narrow, but difficult: Did decedent die testate or intestate?

It is clear that when decedent executed his holographic will, dated December 29, 1939, and when he

---

[1] This estate has been before the register of wills four times; before this court many times, namely, before Judge Saylor, as auditing judge, before Judges Saylor, Burke and Silverstein, as succeeding hearing judges, and before the court en banc twice (with reargument ordered the second time around); and once before the Supreme Court.

executed his "lawyer-drawn" will, dated July 3, 1947, he intended to make certain worthy Catholic charities the beneficiaries of his $300,000 estate. However, it is not clear what his intention was when he died on March 16, 1961.[2] Even if decedent did intend that some or all of the excepting charities should be the beneficiaries of his estate, the critical question remains: Did he leave a valid will to accomplish this intention? Both a testamentary intent and a valid document, as prescribed by law, are requisite to a valid will.

### 1. The 1939 Holographic Will

There is no doubt that decedent's short 1939 holographic will was valid when executed. If he had done nothing after the execution of that will, there would be no problem. However, decedent's 1947 will contained the customary revocatory clause: "hereby revoking any and all former wills or writings in the nature thereof by me at any time heretofore made." At the moment the later will was executed, it effectively revoked the 1939 will. Judge Saylor and Judge Silverstein, who heard successive appeals from the register

---

[2] There is no credible evidence in the record of this case to indicate that he still had "charitable intent" at his death. The only possible evidence to support such assumption is the statement which he allegedly made to Francis J. Kelly about a week before his death, namely, that his will was in his lawyer's office. If this statement was actually made, it confirms contestant's argument that decedent at this point was mentally ill and had completely lost his memory because he knew, or should have known, that: (1) the ribbon copy of his 1947 will had been delivered to him by the scrivener, after its execution, and had been destroyed by theft; (2) the conformed copy had been sent to him by the scrivener after the theft and was lodged with decedent's private papers at his home; and (3) Judge Gleeson could not have had either the ribbon or conformed copy in his office. Hence, this cannot be considered the testamentary intent of a testator of sound mind.

of wills,[3] have found as facts that the execution of the 1947 will was proved by the testimony of the subscribing witnesses, namely, the scrivener, Judge Gerald A. Gleeson, and his secretary, Mary A. Scullin.

The findings of fact in the opinion, dated April 15, 1966, by Judge Saylor, who heard the first appeal from the register, are pertinent:

"It is found as a fact that the will of 1947 was duly executed, that it was stolen or lost while in the possession of the testator, that he was fully aware of the fact and knew that following the burglary he had no will, and that such fact was known to his attorney, who advised him that he had no will, and to Sister Rose Brendan Clearkin, from whom he sought counsel about making a new will.

"The importance of the 1947 will lies in the first paragraph, whereby the testator unequivocally revoked all previous wills. . . .

"The 1947 will was not offered for probate. It was offered for the sole reason that by it the testator revoked all previous wills. The fact of revocation is established as of the date of execution of the revoking will. The testimony of the scrivener and the attesting witnesses to the 1947 will, coupled with the declaration of revocation, evidence conclusive revocation of the 1939 will on July 3, 1947.

"The contention of the proponents of the 1939 will that the conformed copy of the 1947 will was not admissible is without merit. With the scrivener and the other attesting witness themselves verifying the fact of the execution of the original of this instrument, the copy is admitted in lieu of the original.

---

[3] Judge Burke heard some of the evidence on the second appeal, but he became ill and died before all the evidence was submitted; Judge Silverstein was then assigned to complete the case.

"For the purposes here involved the adequacy of the conformed copy and the finality of the testimony as to the matter of execution of the original is established. *The loss by theft or destruction of the original will of 1947 does not, and cannot, alter the fact that the testator by executing it at that moment revoked the 1938* [sic] *will.*" (Italics supplied.)

Moreover, this court, in an opinion written by Judge Shoyer, dated November 10, 1966, decided that the 1947 will, when executed, was a valid will.

As Judge Silverstein correctly stated in his opinion, "For the purpose of revocation, the later will takes effect immediately." This is well-established law. For example, Mr. Justice Bell (later Chief Justice) stated in Gray Will, 365 Pa. 411, 416 (1950):

"The 'other writing' does not have to be a valid or probatable will. Burtt Will, 353 Pa. 217; Ford's Estate, 301 Pa. 183 . . . the more recent authorities hold that this other writing may be an ineffective will [citing cases]."

Likewise, in Koehler Estate, 316 Pa. 321 (1934), the court, speaking through Mr. Chief Justice Frazer, stated, at pages 322 and 323:

"The court below correctly held that, under section 20 of the Wills Act of 1917, P. L. 403, a will could not thus be annulled by parol testimony of an unproduced written revocation; that revocation could be established only by a writing produced, as was done in Ford's Est., 301 Pa. 183, where a copy of a subsequent will revoking an earlier one was properly proved and admitted in evidence, together with the fragments of a still later will which had been crumpled and torn by direction of decedent. . . ."

Similarly, in Forish Will, 16 Fiduc. Rep. 443 (O. C. Schuylkill Co., 1966), the scrivener and his secretary proved the execution of a lost will and produced an unexecuted carbon copy thereof. It was held that this

revoked an earlier will and that decedent died intestate. Judge Bowe stated, at page 447:

"There is no doubt that the decedent revoked the prior will and codicil in accordance with Section 5 (1) of the Wills Act of 1947, supra, by execution of 'some other will . . . in writing.' A long line of cases indicate that the law in Pennsylvania is that proof of a later will, whether or not it has a specific revocation clause, constitutes a revocation of the prior will: McClure's Est., 309 Pa. 370; Burtt Will, 353 Pa. 217; Gray Will, 365 Pa. 411. It follows, therefore, that proof of revocation may be established by the production of the later will, even though it had been revoked and not susceptible of probate: Burtt Will, supra.

"The petitioner contends that since the earlier will and codicil were revoked, and the later will revoked, that decedent died intestate. In the absence of a will executed by decedent subsequent to July 18, 1964, an intestacy would result unless the prior will were republished. . . ."

It follows that in the instant case revocation of the 1939 will by the revocatory clause of the 1947 will became final and absolute the moment the 1947 will was executed and it remained a binding revocation until and unless decedent thereafter validly republished the earlier will, in accordance with the Wills Act of 1947, which provides, 20 P. S. §180.6:

"Section 6. Revival of Revoked or Invalid Will.—If, after the making of any will, the testator shall execute a later will which expressly or by necessary implication revokes the earlier will, the revocation of the later will shall not revive the earlier will, unless the revocation is in writing and declares the intention of the testator to revive the earlier will, or unless, after such revocation, the earlier will shall be re-executed. Oral republication of itself shall be ineffective to revive a will."

No evidence has been produced that decedent

republished his 1939 will. Exceptants argue that the 1939 will was, in effect, republished by the theft of the 1947 will, by decedent's failure to execute a new will, and by his statement near the time of his death that his will was in the office of his attorney. However, the above-quoted statute expressly provides that, to be effective, republication must be in writing; there was no such writing in the instant case.

Ford's Estate, 301 Pa. 183 (1930), is very similar to the instant case. In that case, decedent executed a 1927 will which expressly revoked his 1924 will. Shortly before his death, he revoked the 1927 will by tearing it. The court held that the 1924 will was revoked by the 1927 will and the 1927 will was revoked by tearing; hence, decedent died intestate. The court, speaking through Mr. Justice (later Chief Justice) Schaffer, stated, at page 189, et seq.:

". . . At the very outset of reasoning about the matter let it be observed that we are not dealing, as the court below seems to have concluded, with an attempt to set up an oral revocation of the will of 1924. It was revoked by writings admittedly signed by the testator, which writings so signed are produced. The court below says they are to be disregarded as writings to revoke the earlier will because as wills they could not be effective until he died, and neither for legal reasons was so effective. Dispositively this is so, but as 'other writings' which could be and were proved in the manner wills are, they were facts, which established that by solemn written declaration the decedent had wiped out the will of 1924. As against this we are asked to presume that when he tore and directed the further tearing of the pages of the 1927 will and thus revoked it, he intended to revive the one of 1924 when every circumstance in the record indicates that he did not.

". . . It is contended that wills are ambulatory and amount to nothing until the testator dies. The statute, however, does not limit revocation to 'some other will' but opens the door to 'other writing', and does not say this 'other writing' may not be an ineffective will, so long as it appears, as it does here, that the testator signed it. . . ."

Applying these principles, the 1939 will, although valid when executed, was effectively revoked by the 1947 will at the moment the later will was executed, and it was never validly republished. The fact that the 1947 will was subsequently destroyed and invalidated does not diminish its effectiveness in revoking the 1939 will when executed. Therefore, the 1939 will falls out of the picture.

## 2. The 1947 Will

The will, dated July 3, 1947, was valid when executed. The original will was lodged by decedent in his home safe. Decedent's home was burglarized on December 4, 1953; the safe with its contents was removed by the thieves; and it was never recovered. Judge Gleeson learned of this theft from decedent on January 1, 1954. Judge Gleeson, by letter dated January 5, 1954, sent a conformed carbon copy of the original will to decedent, and advised him that it was only a copy and "not a duplicate original," and that if decedent "wished to dispose of all or any part of his estate by will, that he should make a new will immediately after consulting with a competent lawyer." When Judge Gleeson spoke with decedent on January 1, 1954 and at a chance meeting on G Street upon another occasion, after the execution of the 1947 will, but prior to its theft, decedent informed Judge Gleeson that he had made a change or changes in the will by *writing* upon the original. Several weeks or months

before July 6, 1955, decedent consulted Sister Rose Brendan Clearkin, secretary to the Director of Catholic Charities, at her office, spoke of the "robbery," and inquired of her with respect to making a new will. Sister Clearkin at that time, and by subsequent letter, dated July 6, 1955, advised decedent that he should execute a new will if he wished to make a gift to Catholic Charities. Decedent did not make a new will.

### (a) *The 1947 Will Was Revoked*

Exceptants urge that the Register of Wills properly probated the carbon copy of the 1947 will as a "lost will." However, the original 1947 will was not a "lost will." It was hopelessly destroyed by theft. The Wills Act of 1947 provides the methods of revocation of wills, 20 PS §180.5, viz.:

"Section 5. Revocation of a Will.—No will or codicil in writing, or any part thereof, can be revoked or altered otherwise than:

"(1) Will or Codicil. By some other will or codicil in writing,

"(2) Other Writing. By some other writing declaring the same, executed and proved in the manner required of wills, or

"(3) Act to the Document. By being burnt, torn, canceled, obliterated, or destroyed, with the intent and for the purpose of revocation, by the testator himself or by another person in his presence and by his express direction. If such act is done by any person other than the testator, the direction of the testator must be proved by the oaths or affirmations of two competent witnesses."

Exceptants rely upon the literal wording of subsection 3 of the quoted statute that the destruction must be perpetrated "by another person in his [testator's] presence and by his express direction."

In the instant case, the 1947 will was "destroyed" by theft. Admittedly, this destruction of the will was not done at decedent's "express direction" or "in his presence." However, he knew the will was destroyed. His lawyer and Sister Clearkin advised him to execute a new will, if he wished to die testate. Decedent saw fit not to follow this advice; he did not execute a new will.

Let us suppose that decedent's home had been totally destroyed by fire before his eyes, and everything therein, including his will, had been consumed by the flames. Or, suppose that in his presence and against his will during a quarrel with a relative, she had thrown his will into the fireplace where it was completely burned up, or suppose that she had cut the will into little pieces and tossed the pieces out of the window. In each of these cases, would this constitute a "lost will" which could be probated by producing a copy? In our opinion, it would not. Under each set of hypothetical facts, decedent saw the will destroyed and could not have relied upon an unexecuted copy as a substitute for the original. Moreover, he could not have expected it to be accepted for probate after his death, more than seven years later. We see no difference between the hypothetical facts and the facts in the instant case. In each situation, decedent knew that his original will was hopelessly gone. The law with respect to "lost wills" was not intended to cover wills which testator knew were destroyed. It was meant to apply to the situation where there was clear proof that testator had executed a valid will; there was uncertainty where the will had been lodged; the will could not be found after decedent's death, and there was no explanation as to what had happened to it.

If a decedent could wait seven years, two months and 10 days after the destruction of his will, without

executing a new will, as occurred in the instant case, he could with equal logic have waited 10 years, 20 years, even 60 years, and still his beneficiaries would have the right to have a copy of the destroyed will probated as a "lost will." The mere stating of his proposition demonstrates its weakness.

The Statutory Construction Act, 46 PS §501, et seq., provides that a statute must be so construed as to give meaning to it and to accomplish the legislature's intent, viz., ". . . the intention of the Legislature may be ascertained by considering . . . (4) the object to be attained . . .": Section 51, 46 PS §551. "All other provisions of a law shall be liberally construed to effect their objects and to promote justice":[4] Section 58, 46 PS §558.

The obvious intent of subsection 3 of section 5 of the Wills Act providing for revocation of wills, is to describe circumstances under which a will is revoked by physical acts of destruction. Here, testator's acts constituted revocation by implication. By his failure to write a new will for over seven years, he, in effect, ratified the act of the thief in destroying his will. This revoked it. Any other interpretation would produce illogical results.

Deaves Estate, 140 Pa. 242 (1891)[5] is squarely in point. In that case, about six months prior to his death, testator discovered that his will was missing. Thereafter, he told several persons at different times that he planned to write a new will, but he did not do so.

---

[4] Wills are not included in the enumerated categories in which the statute is to be strictly construed.

[5] Sections 13 and 14 of the Act of April 8, 1833, P. L. 249, were in effect when this case was decided. The provisions of these sections have been reenacted substantially in section 20 of the Wills Act of 1917 and section 5 of the Wills Act of 1947, which is involved in the present case.

The court, speaking per Mr. Chief Justice Paxson, stated, at page 249:

". . . The weak spot in the appellant's case is that there was no proof that the testator left behind him an unrevoked will, or any will whatever. On the contrary, it is an admitted fact that the will, which it was alleged the testator had executed, was lost or destroyed in his lifetime, and that its loss was known to him *months before his death.* There was proof of his declarations that he intended to make another will, possibly containing the same provisions, but he never did so. *Knowing that he had no will, he declined or neglected to make one. From this a presumption of revocation may fairly be inferred . . ."* (Italics supplied.)

The thrust of this holding is that decedent's conduct after the loss of the will showed that he believed he had no will thereafter and that he did not wish to have one.

We cannot accept exceptants' contention that section 5 of the Wills Act of 1947 must be given a strict, literal, inflexible construction. Many decisions can be cited in which our Supreme Court, in order to avoid an unrealistic result has refused to slavishly give a literal interpretation to statutes, particularly those involving decedents' estates. For example, section 13 of the Intestate Act of 1947, 20 PS §1.13, provides that: "Any person entitled under this act to a share of the estate of the decedent must make legal claim to his share of the personal estate within seven years of the death of the decedent or be debarred from claiming such share thereof as shall have been distributed pursuant to adjudication or decree . . ." This is similar to section 21 of the 1917 Act and can be traced back in comparable form to 1863. In spite of the plain language of these statutes, the courts have found ways

to avoid the strait jacket of literalness in favor of common sense interpretation. See Rhodes and Hanne-bauer Estates, 71 D. & C. 330 (O. C. Philadelphia Co., 1950), and cases cited in footnotes to 20 PS §1.13.

Philip A. Bregy, Esq., author of the well-known book, "Intestate, Wills and Estates Acts of 1947," writing an article in the February 1947 issue of Fiduciary Review on this subject, stated:

"The meaning of Section 21 of the Intestate Act has been said to be 'just as obscure today as it was in 1683': Vogest's Est., 31 D. & C. 169, 172. A provision of this sort has, indeed, been on our books since the days of William Penn, and its exact effect is still largely a matter of speculation . . .

"One explanation for this lack of popularity and the continuing uncertainty as to the meaning of the section is that the *courts almost unanimously have refused to sanction the unconscionable results which a literal interpretation would lead to.* The need for judicial correction of the provision became apparent the first time it was brought to the attention of the Supreme Court, and since that time, the courts either have further limited the effect of the provision or have found other grounds for the decision . . ." (Italics supplied.)

Likewise, section 721 of the Fiduciaries Act of 1949, 20 PS §320.721, which provides for review of decrees and adjudications within five years, specifically states that ". . . this section shall not authorize review as to any property distributed by the personal representative in accordance with a decree of court before the filing of the petition." In spite of the plain language of this section, the Supreme Court in Shewchuk Estate, 444 Pa. 249 (1971), affirmed the decision of this court that a long missing daughter was entitled to review

and to receive her father's estate after it had been completely distributed pursuant to an adjudication.

Similarly, in Kehr Will, 373 Pa. 473 (1953), a testatrix wrote "Null and void. S. H. K." on an unexecuted carbon copy of her will when she was unable to obtain the original from her attorney and cancel it. Despite the express language of section 5 of the Wills Act of 1947, this was held to be a sufficient act to constitute revocation of her will, although the original will remained untouched in the possession of her lawyer at her death.

Again, in James Estate, 414 Pa. 80 (1964), despite the express provision in section 6 of the Estates Act of 1947 that accumulations of income "shall be void" does not apply to accumulations of income "for any charitable purpose or purposes," the court held that such accumulations must be limited to a reasonable period. The court, speaking per Mr. Justice Roberts, stated, at pages 85 and 86:

". . . Interpretation of this provision must be in accord with the presumption 'that the Legislature does not intend a result that is absurd, impossible of execution or unreasonable.' Statutory Construction Act, May 28, 1937, P. L. 1019, §52(1), 46 PS §552(1).

"Furthermore, the [lower] court interpreted the statute in its strict, literal sense and held that it was without authority to pass on the reasonableness of the accumulations directed. In doing so, the court erred. We may not view the statute as the mere utilization of words employed in an exclusively literal sense without regard to the social circumstances, charitable needs and public policy surrounding the legislation. So considered, its provisions require the application of a doctrine of reasonableness."

And our colleague, Judge Shoyer, in Whelan Estate,

54 D. & C. 2d 673 (1972), has very recently applied the doctrine of James Estate to avoid a literal interpretation of section 6 of the Estates Act so as to terminate a charitable trust in which accumulations for 30 or 40 years were directed, stating, at page 676:

"However, in James Estate, 414 Pa. 80 (1964), reversing 31 D. & C. 2d 1, where the testator gave his residuary estate in trust to pay one-half the income and after 220 years three-fourths of income every 20 years to a designated charity and to add rest of the income to principal which was to be distributed outright 400 years after the testator's death to the named charity, the Supreme Court held that such direction to accumulate was invalid and contrary to public policy. Even though the Estates Act of 1947, sec. 6, expressly states that it does not apply to charitable trusts, the court, nevertheless, ordered the income distributed on a current basis."

The rationale of the cited authorities is that statutes must be interpreted in a common-sense and reasonable manner and not be confined to unreasonable literalness. It is to be noted that we are applying Pennsylvania law, and not the decisions of other jurisdictions, in the interpretation of our statute in this case.[6]

It has long been settled law that the right to make a will is a matter of grace granted by the sovereign to its citizens. The corollary is that a decedent must comply with the requirements of the statute of wills

---

[6] This is the philosophy adopted by our Supreme Court in Bickert Estate, 447 Pa. 469, 473 (May 25, 1972), which involved the interpretation of section 14(8) of the Wills Act of 1947, which statute is before us in the instant case. There, the court stated: ". . . the cases from other jurisdictions cited by appellant are not helpful in applying the Pennsylvania statutory provision here involved."

to leave a valid will; and if he fails to do so, the sovereign writes his will for him. Equity plays no part in interpretation of the statute of wills. Neither does our view as to testator's wisdom in making his gifts. It is not our duty, or within our power, to disinherit a "laughing heir" and award the estate to worthy charities by the expedient of applying equitable doctrines. If this were the law, we would constantly be rewriting the innumerable, unfair, unreasonable and inequitable wills which come before us. This would be a frightening power for any court to have or to assume.

In the instant case, decedent for over seven years knew that his will had been destroyed, and he had been advised by his lawyer and by Sister Clearkin to write a new will, yet he failed to do so. Literal interpretation of subsection 3 of the statute on revocation would be contrary to the above-stated principles of law and common sense. It follows that the sovereign, by the intestate laws of Pennsylvania, wrote decedent's will and specified that his first cousin was his intestate heir. To adopt exceptants' argument that the 1947 will was not revoked and has been proved as a "lost will" would be to ignore the whole meaning of the statute of wills and the public policy surrounding it, and would be failing to preserve the sanctity of wills. It appears that decedent wished to die intestate. We should follow his wishes, not abort them.

### (b) The Copy of the 1947 Will was not Proved a "Lost Will."

Credible evidence was introduced, and the learned hearing judge has found as a fact, that changes were written upon the original 1947 will by decedent in his own hand before the theft of the will. We do not know what those changes were. However, we do know that

the conformed copy of the 1947 will offered in probate is not an exact reproduction of the original will, with changes upon it, which was stolen. Every provision of the 1947 will is brought into question by Judge Gleeson's testimony which the hearing judge believed.

It is well settled that the precise contents of a "lost will" must be proved by two witnesses who saw the original will executed and knew its final contents. This was the holding in Harrison's Estate, 316 Pa. 15 (1934), where the court, speaking through Mr. Justice (later Chief Justice) Schaffer, stated, at pages 16, 17 and 18:

". . . May a lost will be proven by the testimony of one witness and corroborating circumstances or must there be two witnesses as the Wills Act prescribes?

"Wills differ from all other documents. By statute and judicial decision they are put in a class by themselves in order as far as possible to safeguard their integrity. One of the reasons for this is that the person most concerned about a will cannot come forward to defend it. Death has stilled his tongue . . .

". . . A lost will should not be capable of proof in a way that one produced could not be proven . . .

"The proofs required to establish a lost will have always been required to be strict and complete, as they should be. All our cases show this. Where a lost will is sought to be established there must be produced, not only two competent witnesses of its execution, but *also two witnesses to show its contents* . . . In Hodgson's Est., 207 Pa. 210, 212, we said, speaking though Mr. Justice Kephart: 'Was there *sufficient proof of the contents of the will,* as executed before the two subscribing witnesses, to admit the copy thus identified to probate? . . . The attesting witnesses knew *nothing of the contents of the will, nor did* they

know, (nor could they know, without knowledge of the original) that the supposed reproduction, as offered for probate, was in substance a copy of the instrument they had witnessed. Their testimony was effective for but one purpose, and a very important purpose. It proved a will had been duly executed. There was no other evidence offered tending *to establish the contents, . . .* Under the act, to establish a lost will there must be proof by two witnesses, not only of due execution, *but of the contents*, substantially as set forth in the copy offered for probate. Proof of a lost will is made out only by proof, of execution and *of contents*, by two witnesses, . . ." (Italics supplied.)

Accord: Tribit Estate, 81 D. & C. 29, 32 (O. C. Delaware Co., 1952).

In summary, to prove the conformed copy of the 1947 will as a "lost will," the burden rested upon proponents-exceptants to prove the execution and the contents by two disinterested witnesses. Judge Gleeson, proponents' own witness and one of the only two witnesses produced to prove the will, testified that the conformed copy was not a precise copy because decedent had made changes on the original in writing. He testified that decedent had made changes on the 1947 will *in writing,* after it was executed. Implicit in this is the inexorable conclusion that the copy did not have the same contents as the ribbon copy which was executed. Suppose decedent had written upon the original will "null and void J. J. M." as in Kehr Estate, supra; or beside his signature he had written "cancelled"; or beside paragraphs 3, 4 and/or 5 he had written "cancelled" or "revoked" or "null and void" or "out." Or suppose he had drawn lines of cancellation or XXX's through his signature at the end, or through paragraphs 3, 4 and/or 5. Certainly, these acts would have revoked the will in whole or in part: Kehr Estate,

supra; Diener Estate, 22 Fiduc. Rep. 329 (O. C. Montgomery Co., 1972). We do not know that he did this. We do not know that he did not do this. We do not know what he did. All we know is that he wrote "changes" on his will. Hence the exceptants have failed to produce two witnesses as to the contents of the ribbon copy. Accordingly, they have failed to meet their burden of proof. This is crucial. Per contra, the learned hearing judge found as a fact "conclusively established" that decedent made changes in writing on the 1947 will after it was executed. These findings of fact were not capricious, and, therefore, are as binding as though made by a jury.

We have carefully reviewed the entire record in this case. We believe the testimony of Judge Gleeson that decedent made unknown changes in writing on his original will. To eliminate any possible doubt, and with the express approval of the learned hearing judge, we make the following

## FINDINGS OF FACT

1. Decedent executed the original 1947 will on July 3, 1947, before Mary Scullin and Gerald Gleeson, Esq., as subscribing witnesses;

2. Subsequent to the execution of the 1947 will, decedent made changes in writing upon the original will;

3. Proponents-exceptants have presented to the register of wills, as an alleged "lost will," a carbon copy of the 1947 will, as executed, but without the subsequent changes made thereon in writing by decedent; or any other proof of said changes; and

4. The document presented to the register of wills is not a precise, or substantially exact, copy of the original 1947 will, as it existed at the time of its theft.

And we also reach the following

## CONCLUSIONS OF LAW

1. The carbon copy of the 1947 will is not a precise, or substantially exact, copy of the original at the time of the theft;

2. The exceptants have failed to meet their burden of proving the contents of the alleged "lost will," by two witnesses;

3. This court is not permitted to guess what the contents of the alleged "lost will" are;

4. The copy presented to the register of wills for probate was not a precise, or substantially exact, copy of the original 1947 will at the time of the theft;

5. Exceptants are in no better position than if no copy of the 1947 will had been discovered or produced; and

6. The register of wills erred in probating the said copy and the hearing judge properly sustained the appeal from this action.

(c) *Was the Probate of the 1947 Will Barred by the Two-Year Limitation on Appeals From Probate?*

On October 27, 1964, the register of wills entered a decree directing the probate of the 1939 will. In the accompanying opinion, the register decided that the 1947 will was not "a lost will," stating:

"In sum, this 1947 instrument could not be probated under 'lost will' principles because the testimony is quite clear that decedent considered the original revoked by its loss . . ."

More important than the above statement, the register's decree necessarily decided that the 1947 instrument was *not* decedent's last will. A decedent cannot have *two* last wills, each of which disposes of his entire estate; the later one, by implication, if not by words, revokes the earlier: Burtt Will, 353 Pa. 217 (1945).

The applicable law is section 208 of the Register of Wills Act of 1951, 20 PS §1840.208. Under this statute, any person or party aggrieved by a decree of the register may appeal therefrom *within two years*. Mae E. Gelhaus, decedent's first cousin and intestate heir, appealed. However, none of the exceptants appealed, although this decision of the register was adverse to some of them, and they were fully aware of their rights. The attorney for the charities had demanded that *both* documents be lodged with the register. He could have submitted both wills for probate, and have appealed from the register's decision that the 1947 will was not proved. The charities did not do so. It is true that the Little Sisters of the Poor belatedly sought and received authority to offer the 1947 document for probate. Although their "exception" to Judge Saylor's opinion and decree was filed within two years of the register's decree, it did not constitute an appeal.

Exceptants contend that the 1947 will was never offered for probate, and that under section 303(a) of the Register of Wills Act of 1951, 20 PS §1840.303-(a), this may be done at any time. This argument misconstrues the cited section.

In Morell Will, 21 Fiduc. Rep. 6 (O. C. Lehigh Co., 1970), the court refused to allow probate of subsequent testamentary writings more than two years after the probate of the original will, because such action required an appeal to open the register's decree, and the time for that had passed. The court said, at page 14:

"We concur that section 303(a) applies only to the first probate of a testamentary instrument."

To the same effect is Vanko Estate, 8 Fiduc. Rep. 217 (O. C. Allegheny Co., 1958). See also Costello Estate, 26 D. & C. 2d 481 (O. C. Philadelphia Co., 1962). Other lower court cases reach the opposing

view that section 208 does not act as a bar to probate of a will after expiration of two years under section 303, e.g., Keiper Will, 8 Fiduc. Rep. 647 (O. C. Monroe Co., 1958). See Agnew's Appeal, 37 Pa. 467 (1861).

It follows that exceptants may have offered the conformed carbon copy of the 1947 will too late for probate. In any event, we agree with the learned hearing judge that there is no necessity to decide this point, at least at this time, in view of the other conclusions we have reached in this opinion.

## CONCLUSION

For the reasons set forth herein, together with the reasons stated in the opinion of Judge Saylor, dated April 15, 1966, and the opinion of Judge Silverstein, dated December 3, 1971, we hold that (1) the 1939 will was revoked by the revocatory clause of the 1947 will; (2) the 1947 will was revoked by implication; (3) the carbon copy of the 1947 will was not entitled to probate as a "lost will," because it was not proved by two witnesses to be an accurate copy of the 1947 will, as it existed at the time of its theft and destruction; and (4) possibly the two-year statutory limitation period for probating the 1947 will had expired.

Accordingly, (1) the exceptions to the opinion and decree of Judge Saylor, which this court heretofore "dismissed without prejudice," are now dismissed absolutely; (2) the exceptions to the opinion and decree of Judge Silverstein are dismissed absolutely; (3) the letters of administration, d.b.n. granted to Francis G. Wenzel on May 27, 1969, because of the death on May 2, 1969, of Francis J. Kelly, Administrator, who was appointed April 4, 1961, are reinstated; and (4) the record with respect to the probate of the 1939 will and the probate of the conformed copy of the 1947 will are remitted to the register for action in accordance with this opinion.

Judges Saylor and Pawelec concur in the result.

Judge Shoyer is filing herewith a dissenting opinion.

## DISSENTING OPINION

SHOYER, J. August 17, 1972.—We are called upon to decide whether James J. McCaffrey, in his eighty-ninth year, died testate or intestate.

Admittedly, this decedent executed a lawyer-drawn will on July 3, 1947, which complied with all the solemn and formal requirements of the Pennsylvania Wills Act. Admittedly, his ribbon copy, duly executed, was stolen when his home was burglarized on December 4, 1953. Admittedly, he was told by his "former" lawyer that he should make a new will. Admittedly, he carefully preserved a conformed copy of the original which he received from the same lawyer after the burglary. Admittedly, there is no evidence of any change in his 100 percent charitable intent as first declared in his 1939 will.[1] Nevertheless, a majority of this court declares that a first cousin, who lived in California, who was not mentioned in either of his two wills, a true "laughing heir," shall inherit his sizeable estate.[2]

---

[1] Quite to the contrary, the visit of testator to Sister Rose Brendan Clearkin, her testimony, and her letter form incontrovertible evidence that his interest in Catholic charities *continued.* The inaccurate statement in the letter from his former attorney that a new formal will containing gifts to charities must precede death by 30 days, failed to mention the exception that where the later instrument contains "an identical gift for substantially the same religious or charitable purpose, the gift in the later will or codicil shall be valid." Such incomplete instruction may well have added to the confusion of this aged and retired testator, already upset by the burglary.

[2] Actually, the distributee would now be the estate of this cousin who has since died.

Testamentary intent, statutory revocation, *animus revocandi*—these precepts comprise both the old and the new testament of the law of wills. Centuries of experience have proven that faithful adherence[3] to their spirit as well as their letter serves best the interests of the testator, his heirs and the community.

My colleagues have approached this issue as a problem in testamentary intent, whereas I regard it as a problem of revocatory intent. Under Pennsylvania law, the requirements for making a valid will are of statutory origin. No less exacting are the requirements regarding revocation. The origin of *all* the American statutes pertaining to revocation, including our own, may be traced to the English Statute of Frauds, sections VI and XXII, 29 Car. II C.3 (1677). The Statute of Frauds and the American statutes based thereon clearly regulate revocation by some visible act manifest on the instrument, or revocation by a later will, codicil or other instrument. *Implicit* in the application and construction of these statutes is the intent to revoke, *animus revocandi. Explicit* in the same statues is the prohibition against oral revocation of any written will or testament. Thus, section 22 of the Statute of Frauds provided that "no will in writing . . . shall be repealed, nor shall any clause, devise or bequest therein be altered or changed by any words, or will by word of mouth only, except the same be in the life of the testator committed to writing, and after the writing thereof read unto the testator, and allowed

---

[3] Our Supreme Court has steadfastly resisted "lax interpretation" and wisely enforced the legislative mandate that a will "shall be signed by the testator at the end thereof ": Section 2 of the Wills Act of 1947, 20 PS §180.2; Weiss Estate, 444 Pa. 126 (1971); Baldwin Will, 357 Pa. 432, 440 (1947) (signature at beginning or top); Brown Estate, 347 Pa. 244, 246 (1943) (signature to left).

by him and proved to be done by three witnesses at the least": Roberts' Digest, P.310.

Historically, bold attempts to defeat wills by fabricating evidence of the oral declarations of the testator had become so frequent and so scandalous that the enactment of legislation such as the Statute of Frauds had become an absolute necessity. See Page on Wills (Bowe-Parker Revision) vol. 2, §21.3, where sections VI and XXII of the Statute of Frauds are quoted at length.

The learned hearing judge, despite the lack of any direct evidence that McCaffrey had ever adopted or ratified the felonious destruction of his will, had found "a presumption of revocation." We are familiar with the application of this presumption where there is no known explanation for the disappearance of a will last known to be in testator's possession prior to his death. Here, however, the burglary of McCaffrey's will on December 4, 1953, was definitely established by insurance records and agreed to as a fact by all counsel. Nevertheless, the learned hearing judge has reasoned that the "failure of the testator to publish another will after notice that his last will had been destroyed operated as a presumption[4] of an intent to adopt the loss as a revocation." On this presumption, he bases his finding that the 1947 will was revoked by testator in his lifetime.

---

[4] In Watkins v. Prudential Ins. Co., 315 Pa. 497, 504 (1934), our Supreme Court classified presumptions. "Presumptions arise as follows: They are either (1) a procedural expedient, or (2) a rule of proof production based upon the comparative availability of material evidence to the respective parties, or (3) a conclusion firmly based upon the generally known results of wide human experience, or (4) a combination of (1) and (3)." I am unable to fit the presumption of the learned hearing judge into any of these four classifications.

Our court en banc is not bound by this finding of fact which is based only on inference, and we are entitled to draw our own inferences and to make our own conclusions even though they differ from those of the trier of fact: Kalvyas v. Kalvyas, 371 Pa. 371, 375, 376 (1952); Gelmont Lab., Inc. v. Heist, et al., 300 Pa. 542, 547 (1930); Bailey Estate, 22 Fiduc. Rep. 231, 238 (O. C. Phila., 1972). The majority, dissatisfied (as am I) with the reasons advanced by the learned hearing judge in support of his holding, has substituted its own findings of fact and conclusions of law.

Of larger significance, however, the presumption of the learned hearing judge and the new findings are against the great weight of legal authority which holds that "ratification of an unauthorized act of mutilation by another does not work a revocation": Atkinson, Law of Wills (2d ed., 1953) §86, p. 440. In Page on Wills, op. cit. §21.32, p. 393, this learned author cogently reasons as follows:

". . . Under a statute such as the Statute of Frauds . . . which requires the testator's intention to revoke to be expressed by some act manifest on the will or by a subsequent will or codicil, it would seem impossible to revoke a will by a subsequent ratification of an act which was done without the testator's authority. When the act was done, it did not operate as a revocation; and to hold that the subsequent ratification makes such act amount to a revocation, is to ignore the provisions of such statutes and to revoke the will by the testator's subsequent *oral* declarations." (Italics supplied.)

In Davis v. Davis, 214 S. Car. 247, 52 S.E. 2d 192 (1949), where testator's will was lost when his home was destroyed by fire, it was held that no presumption that testator destroyed the will animus revocandi exists,

as a result of this misfortune, and the mere fact that testator has knowledge of the accidental destruction of the will does not give rise to a presumption that testator intended to adopt the accidental loss as a revocation. Further, the fact that testator intended to make another will after the first will was destroyed was no evidence that he intended to adopt the accidental destruction of the will as a revocation thereof. In Murphy's Estate, 217 Wis. 472, 259 N.W. 430, 99 A.L.R. 519 (1935), it was held that the fraudulent destruction of testator's will, where there was no subsequent expression of intent that the will was revoked, and no change in testator's condition or circumstances from which revocation could be implied, was not a valid revocation. In so holding, the Wisconsin Court relied on Page op. cit. and other authorities on the law of wills.

In Roman Will, 80 N. J. Superior Ct. 481, 194 A. 2d 40 (1963), the court decided that failure of testator to rewrite his will, which was admittedly stolen seven months before his death, did not legally amount to revocation by adoption of the loss.

The English cases are to the same effect. Thus, in Gill v. Gill [1909] Prob. 157, it was held that where a will has been torn up without testator's authority, he cannot, by any subsequent ratification of the destruction, render the act a revocation. In Booth v. Booth [1926] Prob. 118, it was held that where a will was accidentally destroyed by fire *eight* years prior to testator's death at age 81, mere acquiescence by him would not amount to a valid revocation.

The Court of Appeals of New York in Fox Will, 9 N. Y. 2d 400, 174 N.E. 2d 499 (1961), relying on an earlier case of Schultz v. Schultz, 35 N. Y. 653, held that there could be no oral adoption by testator of the

revocation of his fraudulently destroyed will and it made no difference whether or not he knew of the will's destruction prior to his death. It was further held that "the son's testimony as to his father's 'oral adoption' of the prior destruction was inadmissible as hearsay or on general principles developed in the law of wills [citing cases] or that, even if admissible, the testimony did not negate a 'fraudulent destruction' within the meaning of the relevant statute . . ." Page 502.

The court said, at page 505:

". . . If a prior destruction of a will without 'the intent and . . . the purpose of revoking the same' may subsequently be 'orally adopted,' with the effect of preventing its probate, our courts will again be forced, as the Appellate Division was in this case, to rely on parol evidence to defeat or sustain a writing executed with all of the formalities required by law. This is precisely the condition found obnoxious at common law and which was sought to be avoided by the enactment of section 34 of our Decedent Estate Law . . ."

The New York Court in Fox Will makes it graphically clear that oral testimony which tends to revoke or amend a formally executed will is inadmissible. Thus, the testimony of Judge Gleeson in his three court appearances can be accepted only as to proof of the execution of the 1947 will and the contents of the same when executed, the rest must be disregarded as hearsay or as an attempt to do orally that which is prohibited by the statute. No mere oral statement of testator himself in the presence of innumerable witnesses would suffice either to amend or revoke his formally executed will. While the will and contents were adequately proven by the testimony of Miss Scullin and Judge Gleeson and their identification of the conformed copy, it must follow that the additional testimony of Judge

Gleeson which grew from "impressions" to "writings," and finally to "changes" in his third court appearance, can be given no legal effect.

In Williams' Estate, 336 Pa. 235, 237 (1939), we read:

"Under similar provisions in earlier acts it was held that unsigned writings, on the margins, back or other parts of the paper on which the will was written, even though written after the will was executed and expressing an intention that the will be revoked, were not effective, and that the will should be probated and the subsequent writings disregarded: Lewis v. Lewis, 2 W. & S. 455; Heise v. Heise, 31 Pa. 246; Saunders v. Samarreg Co., 205 Pa. 632, 55 A. 763. See also Dixon's App., 55 Pa. 424; White's Est., 262 Pa. 356, 105 A. 549. As is conceded, the writings here in question cannot be considered as a revocation under the first method prescribed by the act, that is as 'a will, codicil or other writing declaring the same,' since they were not signed at the end thereof, a necessary prerequisite to the proper execution of wills: Act of 1947, supra. Nor can they be given effect as a cancellation, obliteration or destruction of the will, the testamentary provisions of the will remaining untouched by their addition."

In Leonard Estate, 427 Pa. 363 (1967), our own Supreme Court has recently held that, page 367:

"Oral testimony alone that the will of May 22, 1958, was revoked by an alleged will dated November 8, 1963 is not sufficient to prove revocation and such evidence is not admissible: Shetter's Estate, 303 Pa. 193, 197, 154 A. 288 (1931); Koehler's Estate, 316 Pa. 321, 323, 175 A. 424 (1934)."

Not only should the letter of the statute be observed in this case to prevent the oral revocation of the will (see Clingan v. Mitcheltree, 31 Pa. 25, 36 (1856)), but especially must this follow when it is so clear that this testator never abandoned his natural intention of

giving his entire estate to Catholic charities in the absence of surviving spouse, children, parents, siblings or other close kin. There is not a line in the record to indicate that he ever thought of Mrs. Gelhaus, who had left Philadelphia in 1905, as a desirable beneficiary of his estate.

In 1966, my colleagues and I were in unanimous agreement that the 1947 will should be offered to the register for probate. They have apparently forgotten what they approved at that time, 40 D. & C. 2d 645, 652; 16 Fiduc. Rep. 604, 612:

"It must be acknowledged that burglary of one's home is a grievous and traumatic experience for any law-abiding citizen, and especially one who has reached the age of 82. When Sister Rose Brendan Clearkin wrote decedent on July 6, 1955, one of her deepest impressions retained from his earlier visit was his 'worriment about the robbery'. When she testified before the register, she could not remember the exact purpose of decedent's visit, nor any express statements he might have made about the present existence of a will. In the light of the recent holding in Baum Estate, 418 Pa. 404, 409 (1965), that the carbon copy of a will 'made at the same time, by the same typewriter and the same strokes . . .' is an *original*, it would seem that McCaffrey's then mental appraisal of his own status—viz., whether he remained presumptively testate—could be deemed equivocal, to say the least. And Mr. Kelly's telephone call to Judge Gleeson just a week before his death indicates decedent's dominant thought that he still possessed a valid will."[5]

---

[5] To those householders who have personally experienced a burglary with its shattering annihilation of one's sense of security, no proof of the traumatic effect is necessary; they have suffered it. Here, the letter of Sister Rose Brendan Clearkin proves its existence for the instant record.

Now, my colleagues say that "testator's acts constituted revocation by implication" and that by his seven years' delay this octogenarian "in effect ratified the act of the thief in destroying his will." They might better call their theory "ratification by procrastination." I perceive it as a spurious doctrine resting on a flagrant breach of the time-honored requirement of animus revocandi. Deaves's Estate, 140 Pa. 242 (1891), does not support the majority, because fraudulent suppression of decedent's will was not there established. The of decedent's will was not there established. The factual situation was totally unlike the present. "For anything we know, he [decedent] may have destroyed his will because he was not satisfied with its provisions, and yet have desired to conceal the knowledge of that fact to avoid importunity": so spoke our Supreme Court at page 249. In fact, Deaves was but a routine judicial application of the presumption that a testator in possession of his original will is *presumed* to have intentionally destroyed it where no other explanation for its absence is forthcoming.[6] My colleagues are in error when they rely on this decision as an extension of the well-known presumption of revocation.

My colleagues call for a broad, liberal construction of the statute on revocation and cite Ford's Estate, 301 Pa. 183 (1930); Kehr Will, 373 Pa. 473 (1953); and Shewchuk Estate, 444 Pa. 249 (1971). A major distinction in all three of the above cases is that, in each instance, our Supreme Court was approving a distribution in favor of an only child, the natural heir of the decedent. A truly equitable result was thrice achieved by our Supreme Court, yet my colleagues contradict

---

[6] Atkinson, in his Handbook on the Law of Wills, assigns this decision to the category of unexplained disappearance: Atkinson, op. cit. §97, p. 507, note 10.

themselves by insisting that "[e]quity plays no part in interpretation of the statute of wills."

The majority initiates its process of reasoning with the ancient maxim that one who dies intestate is satisfied to have the Commonwealth make a will for him. My colleagues then adopt a non sequitur corollary that knowledge of the felonious destruction of his valid will requires the testator to *again* fulfill the statutory requirements of executing a formal testament.[7] Successive steps along the path of error follow.

Thus, in 1966, my colleagues agreed *"Destruction of this copy* [of his 1947 will] by testator might be deemed positive ratification of the original's revocation by spoliation (cf. Kehr Will, 373 Pa. 473 (1953)), but certainly no such conclusion can attend its *retention"*: 40 D. & C. 2d, at page 652; 16 Fiduc. Rep., at page 612. Now, the majority completely ignores the fact that the conformed copy of the 1947 will, which was produced in court, was *carefully preserved* by McCaffrey. Instead, relying on very indefinite oral testimony that testator had made "changes" in his 1947 will, my colleagues, despite their confessed lack of knowledge, *assume* that these were valid changes complying with the specific requirements of section 5 (2) of the Wills Act that such writings must be "executed and proved in the manner required of wills."

---

[7] Here is the real clue to the rulings of the majority. McCaffrey should have made a new will within seven years; even though the legislature has not required it, the majority demands it. I consider this not flexible judicial construction, but bald judicial legislating, which is entirely unwarranted where the statute has such a sound historical background and has so well stood the test of time. It seems that the majority has reacted emotionally more to its own hypothetical illustrations than to the actual facts surrounding McCaffrey.

This is really a compound error because my colleagues have accepted inadmissible and invalid oral evidence to cast doubt upon the verity of the conformed copy and have ignored our appellate authorities which hold that proof of the contents of a last will need only be "substantial": Harrison's Estate, 316 Pa. 15, 18 (1934), quoting with approval Hodgson's Estate, 270 Pa. 210, 212 (1921), and Lawman's Estate, 272 Pa. 237, 239 (1922). For "substantial" they have substituted in their findings of fact and conclusions of law the formula of "precise, or substantially exact." Such modification is unwarranted. I can find no valid proof in this record which substantiates such finding, nor any precedent to support their conclusion. The result is tragic in that it penalizes the normal inertia of an octogenarian which has been aggravated by the felonious act of a thief.

Where a valid will has been willfully and maliciously suppressed by a burglary as in the instant case, it is neither fair nor reasonable that a testator should be called upon to reaffirm his testamentary intent. If he then prefers intestacy, he may acknowledge the destruction of his will by some cautionary act *in writing*, signed at the end, which expresses his intent to die intestate even though he continues to preserve a conformed copy of his will. But there is no good reason why the law should demand that he again *formally express* his desire to die testate unless his testamentary intent has *clearly and undeniably* undergone a change since the destruction of the instrument. Atkinson, a current authority on wills, says that it would be a "hardship," unjustified by any legal theory, to *require* a testator to solemnly restate his testamentary intentions just because of the felonious destruction of his original will: Op. cit. §86, page 440.

Contestant has raised the additional objection that

this record does not show an appeal from the action of the register by the proponents as "an aggrieved party." This objection is highly technical and, in view of the fact that the orphans' court follows and applies equitable principles, the objection is lacking in merit. From a period of a few months following the death of this testator, the issues were drawn and have remained the same ever since, to wit: Did James J. McCaffrey die testate or intestate? The same parties have been involved from the beginning and the matter has been lis pendens from the beginning. Section 208 of the Register of Wills Act, 20 PS §1840.208, is, like other statutes of limitation, a statute of repose. Here, no party has rested nor given the impression to his adversary that he has retired from the conflict. For contestant to succeed by reliance on this bar would be a harshness unknown to a court of equity. See Publicker Estate, 4 Fiduc. Rep. 237 (O. C. Chester County, 1954).

For the reasons set forth above, I respectfully and earnestly dissent from the action of my colleagues in sustaining the appeal of the first cousin's personal representative from the action of the register of wills in admitting the 1947 will to probate.